## CASE NO. 22-1236

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

## UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

## LERON LIGGINS,
*Defendant-Appellant.*

On Appeal from the United States District Court for the
Eastern District of Michigan
No. 2:18-cr-20071-1 (Hon. Stephen J. Murphy, III)

## BRIEF OF APPELLANT LERON LIGGINS

## ORAL ARGUMENT REQUESTED

Wade G. Fink (P78751)
WADE FINK LAW P.C.
550 West Merrill Street, Suite 100
Birmingham, Michigan, 48009
(248) 712-1054
wade@wadefinklaw.com
*Attorneys for Appellant Leron Liggins*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES………………………………………………...iii

STATEMENT REGARDING ORAL ARGUMENT……………………….vii

STATEMENT OF JURISDICTION………………………………………….1

STATEMENT OF THE ISSUE………………………………………………2

STATEMENT OF THE CASE AND PERTINENT BACKGROUND…………....3

SUMMARY OF THE ARGUMENT………………………………………..17

ARGUMENT………………………………………………………………...18

I.     THE DISTRICT COURT JUDGE SHOULD HAVE RECUSED HIMSELF FOR BIAS AGAINST DEFENDANT. BECAUSE HE DID NOT, DEFENDANT IS ENTITLED TO A NEW TRIAL, OR, AT A MINIMUM, TO BE RE-SENTENCED BY A DIFFERENT TRIAL JUDGE…………………………………………………………………..18

II.    THE DISTRICT COURT ERRED IN DENYING A MOTION FOR NEW TRIAL BASED ON ADMISSION OF EVIDENCE DERIVED FROM AN ILLEGAL WIRETAP. ALTERNATIVELY, TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE THE ISSUE PRIOR TO TRIAL………………………………………………………………...29

III.   THE TRIAL COURT VIOLATED DEFENDANT'S FAIR TRIAL RIGHTS WHEN IT PRECLUDED TRIAL COUNSEL FROM QUESTIOING A WITNESS ABOUT ANOTHER WITNESS'S MOTIVATION TO LIE….42

IV.   THE ADMISSION OF STATEMENTS MADE BY MURPHY ON INSTAGRAM WAS ERROR BECAUSE THE STATEMENTS WERE HEARSAY………………………………………………………45

V.    IF THE COURT GRANTS RELIEF OF ANY KIND, IT SHOULD REMAND TO A DIFFERENT TRIAL JUDGE…………………………..47

CONCLUSION…………………………………………………………………...48

CERTIFICATE OF COMPLIANCE…………………………………………...48

CERTIFICATE OF SERVICE………………………………………………....49

DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS………..49

## <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>

<u>Supreme Court</u>

*Davis v. Alaska,*
    415 U.S. 308 (1974)………………………………………………...44

*Herrin v. New York,*
    422 U.S. 853 (1975) ……………………………………………….44

*Kimmelman v. Morrison,*
    477 U.S. 365, 375 (1986)… ………………………………………….40

*Liteky v. United States,*
    510 U.S. 540 (1994) …………………………………………….*passim*

*Nix v. Williams*,
    467 U.S. 431, 444 (1984)… ………………………………………….38

*Silverthorne Lumber Co. v. United States*,
    251 U.S. 385, 392 (1920)… ………………………………………….38

*Strickland v Washington,*
    466 U.S. 668 (1984)… …………………………………………….*passim*

*Sullivan v. Louisiana,*
    508 U.S. 275, 283 (1993)… ………………………………………….28

*Ungar v Sarafite,*
> 376 U.S. 575 (1964)… ……………………………………………………20

*United States v Giordano,*
> 416 U.S. 505, 524 (1974)… …………………………………………...33, 34

Circuit Courts of Appeal

*Anderson v Sheppard,*
> 856 F.2d 741 (6th Cir. 1988)… …………………………………………23

*Armco, Inc. v. United Steelworkers,*
> 280 F.3d 669, 683 (6th Cir. 2022)…………………………………………47

*Hendrix v. Palmer*,
> 893 F.3d 906, 922 (6th Cir. 2018) ….……………………………………...41

*In re Antar (Antar II),*
> 71 F.3d 97 (3d Cir. 1995)…. ….…………………………………………23, 25

*In re Searches and Seizures Conducted, Etc.,*
> 665 F.2d 775 (7th Cir. 1981)…. ….………………………………………...31

*McCorkle v United States,*
> ___ F App'x ___ (6th Cir. November 6, 2012)… ….………………………..42

*Smith v. United States,*
> 348 F.3d 545, 554 (6th Cir. 2003)… ….……………………………….…...47

*U.S. v Antar,*
> 53 F.3d 568 (3d Cir. 1995)… ….……………………………….…...22, 23

*United States v Bray,*
> 546 F.2d 851, 859 (10th Cir. 1976)… ….………………………………...28

*United States v. Gaitan-Acevedo,*
> 148 F.3d 577, 589 (6th Cir. 1998)…. ….………………………………...37

*United States v. Hartsel,*
> 199 F.3d 812 (6th Cir. 1999)… ….………………………………….…...27

*United States v. McClain,*
    444 F.3d 556 (6th Cir. 2005)…. ….……………………………………………37

*United States v. Munoz,*
    605 F.3d 359 (6th Cir. 2010)… ….……………………………………………32

*United States v. Pearson,*
    203 F.3d 1243 (10th Cir. 2000)…. ….……………………………………...23

*United States v. Potter,*
    927 F3d 446, 448 (6th Cir. 2019)… ….……………………………………31

*United States v Rice,*
    478 F3d 704, 710 (6th Cir. 2007)….. ….……………………………….....33

*United States v. Smith*,
    546 F.2d 1275 (5th Cir.1977)… ….……………………………………32, 38

*United States v. Trammel,*
    404 F.3d 397, 399 (6th Cir. 2005)…. ….…………………………...45

*U.S. v. Vonner,*
    516 F.3d 382 (6th Cir. 2008)… ….……………………………………...29

*U.S. v. Wright,*
    2020 U.S. Dist. LEXIS 198340 (2020)…. ….……………………………..26

*U.S. v Whitman,*
    209 F.3d 619 (6th Cir. 2000)… ….……………………………………..23, 24

*United States v. Williams,*
    615 F.3d 657, 660 (6th Cir. 2010)…. ….…………………………………..38

*Williams v. United States*,
    632 F. App'x 816, 821 (6th Cir. 2015)…. ….……………………………...40

## <u>STATUTES AND RULES</u>

21 U.S.C. §841……………………………………………………………...1,3

21 U.S.C §846……………………………………………………………………1,3

18 U.S.C. §2………………………………………………………………………..1

28 U.S.C. §455(a)………… ………………………………………………...20, 21

18 U.S.C. §2510…...…………………………………………………………*passim*

18 U.S.C. 924(c)…. …..……………………………………………...44, 46, 48

Fed. R. Crim. 33……..……………………………………………………30, 31, 32

Fed. R. Evid. 801, 802,
803…………………………………………...……………………………………..46

## SECONDARY SOURCES

*Rex v Sussex Justices; Ex parte McCarthy*
    [1924] 1 KB 257 at 259 per Lord Hewart CJ…..……………………….....24

LEXIS Analytics, *Stephen J. Murphy III* (May 17th, 2022)………………………26

## STATEMENT REGARDING ORAL ARGUMENT

Defendant-Appellant Leron Liggins requests oral argument under Fed. R. App. P. 34(a). This case involves sensitive and difficult issues of judicial bias, as well as difficult questions regarding the attenuation of testimony from unlawfully obtained evidence. This Court would benefit from a thorough, candid back-and-forth with counsel about these issues. Liggins was not heard by his trial judge, so he asks to be heard by this Court.

## STATEMENT OF JURISDICTION

The Superseding Indictment under which Leron Liggins was charged stated offenses against the United States defined in 21 U.S.C. §841(a)(1), (b)(1)(B); 21 U.S.C §846; and, 18 U.S.C. §2. The trial court had subject matter jurisdiction over the proceedings under 18 U.S.C. §3231. Leron Liggins appeals from a final judgment of the district court, which disposed of all claims of all the parties to this appeal. On October 25, 2021, Leron Liggins was convicted by jury verdict. On March 22, 2022, Leron Liggins was sentenced to a term of imprisonment. On March 23, 2022, a Notice of Appeal was filed. Accordingly, this Court is vested with appellate jurisdiction over this appeal pursuant to 28 U.S.C. §1291.

# <u>STATEMENT OF THE ISSUES</u>

1. Whether the trial court statements to a criminal defendant – that he looked like a criminal and needed to prove his innocence – demonstrated impermissible bias requiring reversal.

    Appellant answers: Yes.

2. Whether a new trial motion should have been granted based on the use of testimony of a witness who had been discovered using an illegal wiretap. And, if trial counsel was ineffective for failing to bring a motion to suppress on the issue before trial.

    Appellant answers: Yes.

3. Whether the trial court erred in prohibited defense counsel from arguing during his closing that a witness had motivation to lie based on her desire not to be charged under 18 U.S.C. § 924(c).

    Appellant answers: Yes.

4. Whether the trial court's admission of certain social media messages made by a testifying witness to the defendant was error because the statements were inadmissible hearsay.

    Appellant answers: Yes.

5. If the Court provides any relief, should the case be remanded to a different trial judge based on the actual and appearance of bias by the current trial judge?

    Appellant answers: Yes.

## <u>STATEMENT OF THE CASE AND PERTINENT FACTS</u>

*Indictment and Pre-Trial*

On February 6, 2018, Defendant-Appellant Leron Liggins ("Liggins") was indicted on one count of conspiracy to possess with intent to distribute heroin, contrary to 21 U.S.C. § 841(a)(1) and 846. After initially being appointed counsel, Liggins retained counsel on February 20, 2018. ECF No. 10, Attorney Appearance.

The criminal litigation continued unremarkably until March 26, 2019, when Liggins filed a *pro se* request for copies of certain government pleadings and a motion to terminate his attorney. ECF No. 33, Defendant's *Pro Se* Motion, PageID.157. Liggins explained that he felt his attorney had abandoned him. ECF No. 34, Defendant's Brief, PageID.158. Liggins' attorney thereafter asked to withdraw. ECF No. 35, Counsel's Motion to Withdraw, PageID.161. At the hearing on the motion to withdraw, Liggins was deferential and polite, thanking the judge for appointing him an attorney. *See* Transcript of Motion Hearing, April 29, 2019, at 6, PageID.829. The trial court appointed Criminal Justice Act panel attorney, Joseph Arrone, on May 1, 2019.

On September 12, 2019, a year and half into the litigation, the government filed a superseding indictment. ECF No. 42, Superseding Indictment, PageID.180. It added a single count of aiding and abetting possession of heroin, contrary to 21 U.S.C. §841 and 18 U.S.C. §2. *Id.* After additional continuance stipulations were

entered by the Court, Liggins filed another *pro se* document indicating that he was dissatisfied with Mr. Arrone, who, according to Liggins, was stipulating to items without consulting Liggins and not addressing Liggins' discovery concerns.[1] ECF No. 51, Defendant's Motion, PageID.222. The pleading was concise, unoffensive, and non-disparaging. In response to this motion, on January 23, 2020, Mr. Arrone sought to withdraw from the matter. ECF No. 52, Counsel's Motion to Withdraw, PageID.226. In his motion, Mr. Arrone explained that Liggins had rejected a Rule 11 plea offer and was prepared to proceed to trial. *Id.* at PageID.226-227.

The trial court held a hearing on Mr. Arrone's request to withdraw on January 30, 2020. At the beginning of the hearing, the trial judge, the Honorable Stephen J. Murphy, III, began admonishing Liggins, stating, among other things that "[m]ost defendants don't get my attention or stand out, but Mr. Liggins does." ECF No. 80, Transcript of Motion Hearing January 30, 2020, at PageID.394. The reason that Liggins stood out to the trial judge was because he had terminated his first attorney, sought to terminate his second, and "refus[ed] to sign his plea agreement." *Id.* at PageID.394-395. The judge continued, uninterrupted, that he was "tired of this case" and "tired of this defendant." *Id.* When Liggins *politely* asked to address the Court ("Can I speak, your honor?"), the Court responded that he could not. When Liggins

---

[1] These concerns were not only corroborated by Mr. Arrone, but also justified later when the government would later concede that it had conducted illegal wiretaps.

tried to explain he did not wish to be represented by Mr. Arrone, the trial judge

stated: "if you speak anymore, I'll have you hauled out of here." *Id.* at PageID.395.

The trial judge continued to vent his frustration, which clearly revolved

around Liggins' unwillingness to plead guilty and a trial the judge was forced to

cancel. *Id.* at PageID.396.[2] Warranted or not, this frustration culminated in the

following:

> This guy has got my attention, Mr. Arnone. What do you
> want me to do? **This guy looks like a criminal to me.**
> **This is what criminals do. This isn't what innocent**
> **people, who want a fair trial do.** He's indicted in
> Kentucky. He's indicted here. He's alleged to be dealing
> heroin, which addicts, hurts and kills people, and he's
> playing games with the Court. Do you agree?

*Id.* at PageID.396 (emphasis added). Mr. Arrone weakly stated that he could not

"argue with [the judge's] logic." *Id.* Liggins tried to speak again, still addressing the

Court with deference ("your honor"). *Id.* The trial court answered sarcastically,

calling Liggins' filings that of a jailhouse lawyer. Liggins stated that he believed the

---

[2] "Now, I had my staff order jurors for a trial, and we paid the jurors to come
in. And we had them here at great expense. And we had to cancel that because he
said he wanted to plead guilty. Then he also, by the way, said in a Rule 20 proceeding
out of Kentucky, in a court document which was filed with their court and ours, he
was going to plead guilty to the Kentucky case pursuant to Rule 20. Then he comes
in here and says he doesn't want to plead guilty, even though we've got him ready
for a trial. Now I've got him ready for a trial, which he wanted, and he says he doesn't
-- he wants another lawyer. You're the second lawyer, the second good lawyer, and
I am being misled and messed with. And he's sitting here moaning and speaking
under his breath when I told him I wanted to hear from his lawyer. All right?"

government was withholding evidence, to which the trial court, the supposed neutral party, responded: "yeah, right." *Id.*[3] The trial judge then sarcastically asked the Assistant United States Attorney what evidence she was withholding. *Id.* at PageID.398. The Court took the motion under advisement.

The very next day, on January 31, 2020, Mr. Arrone supplemented his motion to withdraw. In his supplement, Mr. Arrone, signing his own name as an attorney, agreed with Liggins that the government may indeed have been withholding evidence, writing:

> [The discovery] was requested when counsel was appointed and should have been provided in a timely manner so that counsel could have had it reviewed by an expert of his choosing and possibly retain an expert to contradict the witness' conclusion. To date, the government has failed to comply with the requirements of Rule 16(a)(1)(G).

ECF No. 54, Supplement to Motion to Withdraw, PageID.242. With regard to potential expert witnesses, Mr. Arrone wrote on Liggins' behalf:

> The Governments Notice is completely devoid of any information that would allow the court to conclude that Agent Hermans' opinion comports with the requirements of Rule 702, 703 and *Daubert*.

*Id.* at PageID.245.

---

[3] Liggins, again, turned out to be right for several reasons. That is not to say there was anything nefarious by the prosecutors here, but merely that Liggins was not filing anything frivolous.

The trial court would eventually grant the motion to withdraw. But in its order, the trial judge represented the January 30th hearing in a way that was quite different from the transcript:

> Finally, during the hearing on the motion to withdraw, Liggins repeatedly engaged in personal outbursts, interrupted the Court and insisted that the Government was "withholding evidence." The government lawyer in charge of the case affirmed that the United States was not "withholding evidence." But the Court will require the Government to file an affirmation on the docket no later than February 14, 2020 that all discovery has been provided and it is not withholding any evidence.

ECF No. 56, Court Order, PageID.250. The characterization of Liggins comments as "personal outbursts" and interruptions does not square with the transcript and seem to more so describe the trial court's behavior.

Over the course of the next year, and through the pandemic, Liggins would be represented by another attorney, John Brusstar, who was then eventually replaced by his trial attorney, Martin Crandall. Mr. Crandall appeared on March 15, 2021. ECF No. 51. Mr. Crandall filed a motion for speedy trial and the government filed a motion to find additional excludable delay. ECF Nos. 73, 74. The trial court, more than a year after its admonishment of Liggins, granted additional delay given the COVID-19 pandemic. ECF No. 75.

On October 6, 2021, Liggins, through counsel, requested additional discovery it had been seeking previously – the pre-sentence report of a cooperating witness.

ECF No. 85, Motion for Discovery, PageID.423. Again, signed by an attorney, Liggins supported his assertion of the "withholding" of discovery by stating this report may contain inconsistent statements. *Id.* The government resisted the motion.

A mere 8 days after this motion, Mr. Crandall wrote that he required additional time to respond to government motions in limine,[4] in part because he had "been overwhelmed the past couple of days with additional discovery coming in from the Government, mostly the download of enormous amounts of information from my client's telephone." ECF No. 91, Defendant's Motion to File Late Response, PageID.460. The trial court permitted Mr. Crandall additional time to respond. *See* Text-Only Order, October 15, 2021.

On the eve of trial, Mr. Crandall filed a motion on behalf of Liggins asking that the trial judge recuse himself based on his comments back on January 30, 2020 being "indicative of bias." ECF No. 94, Motion to Recuse, PageID.470. Mr. Crandall noted that Liggins "insists on this motion." *Id.* Mr. Crandall cited the ethics rules to seek the lawful objectives of his client. *Id.*

The trial judge addressed the recusal motion *after* empaneling a jury. *See* ECF No. 132 (jury voir dire under seal), Jury Trial Transcript, October 19, 2021 (hereinafter, TT-I) at PageID.1069. The trial judge stated that he expected the motion and did not "have any problem" with it. *Id.* at PageID.1060. Judge Murphy then

---

[4] ECF Nos. 83, 84, filed under seal.

began to explain his frustration, mistakenly stating that Liggins had signed a plea agreement (he had not) and the judge's expectation there would be a plea of guilty that day. *Id.* The trial judge's memory fails him again when he stated that at the beginning of the January 30th proceeding he "was fine" and only became "upset" after Liggins "did not like the answer [the prosecutor] gave." *Id.* at 1061-1062. This was not the case, as the trial judge took the bench and immediately began the hearing by stating that Liggins stood out to him in a bad way and admonishing him. ECF No. 80, *supra,* at PageID.394.

The trial judge continued his explanation by stating that "Mr. Brustarr [] agreed with his underlying concerns." TT-1 at PageID.1062. Of course, this too is inaccurate, as Mr. Brusstar was not Liggins' attorney at the time, it was Mr. Arrone. Judge Murphy concluded that "just because I got mad does not mean I'm biased against [] Mr. Liggins." *Id.* But then Judge Murphy made another jarring statement, saying he would "give Mr. Liggins the same rights and opportunities here to demonstrate his innocence or lack of guilty as any other litigant." *Id.* To be sure, Liggins is cloaked in the presumption of innocence and has no burden to demonstrate his innocence or lack of guilty to Judge Murphy or the jury.

While Judge Murphy admitted to being "mad[,] hostile, [and] disapproving," he ultimately blamed Liggins' for being an "obstructionist [] making him mad." *Id.* at PageID.1063. Judge Murphy denied the motion to recuse under *Liteky v. United*

*States,* discussed *infra,* finding that being "imperfect[,] mad[,] [and] stupid" did not make him biased requiring recusal. Judge Murphy also stated, seemingly as an aside, that the motion was untimely for not having been made in the previous 22 months. *Id.* at PageID.1064. He continued, "[b]ut I'm denying the motion for all the reasons I just said, and I assure you I will act in an impartial and fair manner going forward." *Id.* at PageID.1065.

### The Trial

In October of 2015, the government alleged that Liggins checked a bag at Detroit Metropolitan Airport ("DTW") for a flight to Phoenix, but did not board the flight. *Id.* The bag was retrieved by Luz Jiminez ("Jiminez") in Phoenix, but abandoned at the airport, where agents seized it and obtained a warrant to search. *Id.* Inside was cash. *Id.*[5]

Months later, in December of 2015, an individual named Dehaven Murphy ("Murphy") was arrested at DTW for possessing more than 100 grams of heroin in her luggage. *Id.* Murphy pointed the finger at Liggins, alleging that he compelled her to carry the drugs. *See generally, id.* The following year, Liggins was arrested in the Louisville airport with tramadol in his luggage. *Id.* at PageID.433. Much of the

---

[5] The government would later acknowledge that it learned this information from an illegal wiretap of Jiminez's phone, discussed *infra.*

evidence that would later be presented at trial was seized from Liggins that day, including flip phones, an iPhone and a tablet.

The government first called John Ferguson ("Agent Ferguson") to testify. Agent Ferguson a local police officer in Grosse Ile Township, Michigan who was assigned to a DEA Task Force at a Detroit Metropolitan Airport satellite office. ECF No. 133, October 20, 2021, Trial Transcript ("TT-II") at PageID.1112-1113. Agent Ferguson testified that he received a tip from the ATF that on December 3, 2015, Murphy would be departing Detroit's airport headed to Phoenix and he was to investigate. *Id.* at PageID.1118. Agent Ferguson and others secured Murphy's checked bag before it was loaded onto the airplane and a K-9 alerted that narcotics may be inside. *Id.* Murphy was confronted in the waiting area of the airplane gate and gave consent to search her bag. *Id.* at 1125-1126.[6] Agent Ferguson testified that a substantial amount of heroin was found inside the bag. *Id.* at PageID.1128.[7]

Next, the government called Murphy. *Id.* at PageID.1141. Murphy testified that the luggage was hers and she knew it was packed with narcotics. She claimed, however, to be unaware of what substance was inside her bag. *Id.* at PageID.1142-1146. When asked if she was "taking this luggage with drugs inside of it for [herself]

---

[6] Murphy confirmed that she eventually gave consent after initially denying same. *Id.* at PageID.1154.

[7] The parties stipulated that the substance was indeed 333.92 grams of heroin. *Id.* at PageID.1136.

or [] for another person," Murphy answered it was for Liggins. *Id.* at PageID.1146. Murphy testified that Liggins offered her "some money [if she] took the bag to Arizona," where he would pick her up. *Id.* at PageID.1149; 1153.

Specifically, Murphy testified that on the morning of December 3, 2015, she spoke to Liggins about getting to the airport, but could not recall if it was by phone or text. *Id.* at PageID.1150. Liggins allegedly told Murphy to check her bag outside. *Id.* Murphy confirmed that her checked bag was brought into the airport, searched with her consent, heroin was found, and she was arrested. *Id.* at PageID.1155-1156. Murphy also testified that she possessed two cell phones – a personal iPhone and a flip phone given to her by Liggins to communicate with him. *Id.* at PageID.1156.

But before pointing the finger at Liggins, Murphy lied to police. *Id.* at 1156. Murphy "didn't want [Liggins] to get in trouble," but she also "didn't want to get [herself] in trouble either." *Id.* When ATF agents threatened Murphy with "20 years in prison," and after two hours of interrogation, Murphy only then pointed the finger at Liggins and agreed to call him in the presence of police. *Id.* at PageID.1199-1200. In exchange for her cooperation against Liggins, Murphy was ultimately sentenced to probation, as she testified she had hoped for. *See United States v. Dehaven Murphy,* Case No. 16-20416 (E.D. Michigan December 21, 2021).

An important part of Murphy's testimony related to Liggins' alleged prior acts and conversations Liggins and Murphy allegedly had over social media. *Id.* at

PageID.1179. The Instagram conversation that was admitted into evidence contained incriminating statements, by both Liggins *and* Murphy, including a statement from Murphy saying, "U got me caught up end of story." *Id.* at PageID.1184.

Sergeant James Cope testified next. ECF No. 134, Trial Transcript, October 21, 2021 ("TT-III"), at PageID.1213. He testified that he was an investigator with the Arizona Attorney General's Office and was present in the search and seizure of the luggage at the Phoenix airport allegedly sent to Luz Jiminez from Liggins. *Id.* at PageID.1228. He testified that there was over $36,000.00 in the bag. *Id.* at PageID.1231-1233. Finally, he testified that Liggins called the airport looking for the bag. *Id.*

Detective Kevin Koontz, a Detective with Phoenix Police also testified. *Id.* at PageID.1247. The day following the search and seizure of Jiminez's bag, Detective Koontz stated that he observed Liggins fly into Phoenix. *Id.* at PageID.1256. He allegedly approached Liggins, who told him he had packed the bag and missed his flight. *Id.* at PageID.1258. He searched his bags that he traveled with that day without finding narcotics. *Id.*

Luz Jiminez was the next witness. *Id.* at PageID.1263. Jiminez testified that she transported narcotics and cash for Liggins. *See, generally, id.* Jiminez testified about the money she was supposed to pick up at the Phoenix airport in October of 2015 and her connection to Liggins. *Id.* at PageID.1278-1280. Jiminez

acknowledged that the government had wiretapped her phone and that is how they knew to surveil her that day. *Id.* at PageID.1290. Jiminez testified similarly to Murphy, stating that Liggins would place luggage on planes – cash and drugs – and then not board. *Id.* at PageID.1280.

A TSA Agent from the Louisville (Kentucky) airport, Angela Sinclair, was after Jiminez. *Id.* at PageID.1306. She testified to observing what looked like flour or sugar wrapped inside of a towel inside of luggage that bore Liggins' name. *Id.* at PageID.1317. Special Agent Timothy Fritz, a DEA agent in Louisville, Kentucky, corroborated Agent Sinclair's testimony. *Id.* at PageID.1330. He testified that when he arrived at the airport, Liggins was detained with his luggage. *Id.* at PageID.1335. He also testified that the substance in the luggage was tramadol. *Id.* at PageID.1337. Agent Fritz testified that he interviewed Liggins, who admitted the luggage was his. *Id.* at PageID.1344.

Next was Special Agent Chad Hermans, a DEA Agent in Detroit, Michigan. *Id.* at PageID.1352. The government established Agent Hermans' experience in narcotics investigations. *Id.* at PageID.1355-1363. He was asked about pricing for various narcotics, including cocaine ($30,000 to $40,000 per kilo and heroin ($65,000 to $100,000 per kilo). *Id.* at PageID.1365-1366. He also testified about the common practice of adding dilutants to drugs to increase profit margins. *Id.* at PageID.1367. One such substance that is often added is tramadol. *Id.* Agent Hermans

also explained the concept of "check and miss," which refers to checking a bag at one airport, missing the flight, and leaving the bag for someone else to pick up elsewhere. *Id.* at PageID.1367. Agent Hermans also testified that the plane ticket purchased for Murphy had a phone number associated with Liggins' mother and otherwise alleged that Murphy and Liggins' phone connected with each other. *Id.* at PageID.1388-1392. Finally, Agent Hermans days' long testimony concluded with numerous documents and communications purporting to connect Murphy, Liggins, and narcotics dealing. *See, generally,* ECF No. 135, Trial Transcript Volume IV, October 22, 2021 ("TT-IV"), at PageID.1418-1500.

On cross-examination, Agent Hermans testified that Jiminez had her home raided by law enforcement. *Id.* at PageID.1537-1538. Trial counsel attempted to elicit testimony that Jiminez could have been charged with 18 U.S.C. § 924(c), "guns and drugs," which could provide for a stiff mandatory sentence for Jiminez. *Id.* The government objected on relevance and the Court sustained the objection. *Id.* Later, the government sought to preclude trial counsel from arguing in closing argument that Jiminez was motivated to testify the way she did against Liggins to avoid the mandatory penalties of § 924(c). *Id.* at PageID.1560-1561. The trial court did preclude such argument. *Id.*

During closing argument, the government stressed the corroboration between Jiminez and Murphy's testimony. *Id.* at PageID.1585-1592. It also made use of the

Instagram messages. *Id.* at PageID.1584. Defense counsel focused on the credibility issues with the witnesses. *Id.* at PageID.1602-1604. After two hours of deliberations, the jury returned a guilty verdict on both counts. *Id.* at PageID.1666.

Liggins' guideline range was 121 to 151 months. The trial judge said he could in "good conscience" sentence Liggins to 151 months but decided because he liked Liggins' parents to sentence him to 127 months. ECF No. 137, Sentencing, March 22, 2022, at PageID.1695.

*New Trial Motion*

Liggins brought a timely motion for new trial under Fed. R. Crim. P. 33 on December 8, 2021. ECF No. 110 at PageID.649. Liggins argued that there was an illegal wiretap surveilling one of the trial witnesses against him - Luz Jiminez – and that during the illegal wiretap, law enforcement discovered the connection between Liggins and Jiminez. The government acknowledged that the interceptions of Jiminez's conversations "were not properly authorized." ECF No. 115 at PageID.662. The trial court denied the motion. ECF No. 117 at PageID.707. It concluded that the illegal search was "too attenuated" from the evidence related to Murphy admitted at trial. *Id.* at PageID.708. The Court also concluded that Jiminez's testimony was proper because it, too, was "too attenuated" from the illegal wiretap. *Id.* at PageID.709.

This appeal followed.

# SUMMARY OF THE ARGUMENT

First, a United States District Court Judge, sitting in front of the United States seal, told the presumably innocent black criminal defendant that he looked like a criminal. He disparaged the defendant with malice. Later, in refusing to recuse himself, the trial judge misrepresented what happened during the prior hearing. And, to make matters worse, he told defendant he would give him a chance to prove he was innocent or his "lack of guilt." No reasonably prudent person would look at the comments of this trial judge and have comfort that defendant received justice.

Second, the government that a witness in this case was illegally surveilled but avers that the evidence was too attenuated to be inadmissible. The evidence was not attenuated. It was the actual evidence unlawfully obtained – the testimony of a witness whose only connection to defendant was discovered through the unlawful surveillance. The trial court erred when it denied an evidentiary hearing and a new trial motion. And if it did not err in either regard, then defense counsel was ineffective for failing to raise this issue prior to trial.

Third, the trial court erred in precluding defense counsel from commenting during closing argument that one of the cooperating witnesses may have been motivated to lie to avoid a serious gun charge. Fourth, the trial court plainly erred in admitting hearsay evidence – statements made by Murphy to Liggins. And fifth, should this Court grant relief, it should remand to a new trial judge.

## <u>ARGUMENT</u>

### I. THE DISTRICT COURT JUDGE SHOULD HAVE RECUSED HIMSELF FOR BIAS AGAINST DEFENDANT. BECAUSE HE DID NOT, DEFENDANT IS ENTITLED TO A NEW TRIAL, OR, AT A MINIMUM, TO BE RE-SENTENCED BY A DIFFERENT TRIAL JUDGE.

In 1993, the Supreme Court of Israel vacated the conviction and death sentence of John Demjanjuk.[8] The Court reversed an Israeli trial court's finding that Demjanjuk was "Ivan the Terrible," a gas chamber operator who tortured and murdered thousands at a death camp in Nazi Germany. Israeli Chief Justice Meir Shamgar stated that the High Court had "clear[ed] the defendant [] because of reasonable doubt." *Id.*

The question was never whether Demjanjuk's participated in the atrocities of the Holocaust – he most certainly did. The legal question, though, was whether he truly was "Ivan the Terrible." And it turned out that prosecutors had evidence Demjanjuk was a different "Ivan." For many, the decision to free a man responsible for unimaginable cruelty was tragic. But for others, including the undersigned, a Jewish attorney, the acquittal of Demjanjuk stands as a triumph for those who believe in the rule of law and liberty. If the Jewish State of Israel, through its highest court, could set aside its completely justified and understandable bias against a brutal

---

[8] https://www.nytimes.com/1993/07/30/world/acquittal-jerusalem-israel-court-sets-demjanjuk-free-but-he-now-without-country.html

Nazi like Demjanjuk, then it could be relied upon by its citizens to dole out criminal justice with the utmost integrity and fairness.

That is critical to a functioning free nation. It is not just actual fairness, but the *perception* of a fair, independent criminal justice system. For the courts to truly serve their critical function in a democracy, criminal defendants, victims of crime, and civil litigants alike must perceive and believe that the courtrooms they enter are balanced. In criminal cases especially, citizens must believe that lady justice is truly wearing a blindfold.

In this case, the trial judge betrayed these principles of fairness and blind justice when he told Liggins - a tall, built black man -  that he looked like a criminal. Later, the trial judge told Liggins he would have to prove his innocence. These words were not merely unbecoming; rather, these words amounted to an egregious betrayal of American principles of justice. Reversal is required.

### a.  The trial judge's appearance of, and actual, bias.

The trial judge's behavior in this case was atrocious. While the entire hearing in January of 2020 was problematic, the trial judge's words that were most resounding bear repeating:

> This guy has got my attention, Mr. Arnone. What do you want me to do? **This guy looks like a criminal to me. This is what criminals do. This isn't what innocent people, who want a fair trial do.** He's indicted in Kentucky. He's indicted here. He's alleged to be dealing

> heroin, which addicts, hurts and kills people, and he's playing games with the Court. Do you agree?

ECF No. 80, Transcript of Motion Hearing January 20, 2020, at PageID.396 (emphasis added). The trial judge should have recused himself for bias. His decision not to is error.

Liggins moved for recusal of the trial judge on October 18, 2021. ECF No. 94, at PageID.470. The trial judge denied this motion citing *Liteky v. United States,* 510 U.S. 540 (1994). He wrongly explained that he would "give Mr. Liggins the same rights and opportunities here to demonstrate his innocence or lack of guilt as any other litigant." TT-1 at PageID.1062. *Liteky* does not support the trial judge's decision to deny the recusal motion. And the judge's assurance of fairness to Liggins is troubling given Liggins was presumed innocent rather than in a position to prove his "lack of guilt."

Federal law provides that "[a]ny justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might be reasonably questioned." 28 U.S.C. §455(a). The statute, amended in 1971, included subsection (a) as a "catchall recusal provision," which requires a court to "evaluate[] on an objective basis, so that what matters is not the reality of the bias or prejudice, **but its appearance**." *Liteky,* at 548-549 (emphasis added).[9] The statute provides

---

[9] *See also Ungar v Sarafite,* 376 U.S. 575, 588 (1964) ("a judge can and should be disqualified for 'bias, a likelihood of bias, or even an appearance of bias.'");

"[q]uite simply and quite universally, recusal was required whenever 'impartiality might reasonably be questioned.'" *Id.*

Liggins agrees with the trial court's reliance on *Liteky*, but disagrees with the trial court's conclusion because it completely misunderstands *Liteky*. The Supreme Court weighed what bias and prejudice of a judge meant in the context of its "extrajudicial source" doctrine, §455(a), and the jurisprudence that developed around both. *See, generally, id.* Ultimately, the Court held that a finding of bias or prejudice does not necessarily have to be from an "extrajudicial source," but rather, "predispositions developed during the course of a trial will sometimes (albeit rare) suffice." *Id.* at 555.

In *Liteky*,[10] the defendants were charged with vandalism at a military base as part of a political protest. The trial court stated the defense was not permitted to make political arguments in opening statements or closing argument and interrupted defense counsel's closing argument to "instruc[t] him to cease the introduction of new facts, and to restrict himself to discussion of evidence already presented." *Id.* at 542-543. The Supreme Court ultimately ruled that trial rulings almost never form the basis for recusal, which is essentially what happened in *Liteky* and the Court was

---

*Murchison*, 349 U.S. at 136 ("[O]ur system of law has always endeavored to prevent even the probability of unfairness.").

[10] *Liteky* was a 9-0 ruling.

comfortable that those rulings could be challenged on appeal. *Id.* at 555. The *Liteky* Court also found that the opinions formed by the judge based on the events of these proceedings did "not constitute a basis for a bias or partiality motion" because they did not "display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Id.*

It is this latter holding that Judge Murphy grabs as a buoy, stating as his basis for not recusing himself the notion that a judge can be "critical or disapproving of, or even hostile to, counsel, the parties, or their cases…" *Id.*; *see also* TT-I, at PageID.1063-1065. But Judge Murphy fails to acknowledge the extreme difference between *Liteky,* where the Court made an evidentiary ruling at trial, and here, where the trial judge told a man who stood before him innocent that he instead "look[ed] guilty" and later said he would have to prove his innocence. That is not a judicial ruling, nor merely critical or disapproving, rather those remarks "display a deep-seated [] antagonism that would make fair judgment impossible" because Judge Murphy is denying Liggins his basic Constitutional right of the presumption of innocence. This commentary was not like *Liteky,* where the Court found the trial judge to demonstrate mere "impatience, dissatisfaction, annoyance, anger, and ordinary efforts at court administration." *Id.* at 556.

In *U.S. v Antar,* 53 F.3d 568 (3d Cir. 1995), the Third Circuit held that where "a reasonable man, were he to know all the circumstances, would harbor doubts

about the judge's impartiality," then judge must recuse himself. *See also United States v. Pearson,* 203 F.3d 1243, 1277 (10th Cir. 2000) (holding same). The trial court in *Antar* stated: "[The defendant] does not come in here with a halo on his head based upon the testimony I heard in this case. I can't close my eyes to it or put blinkers on. [He] is not some innocent bystander." The Third Circuit found this statement to be indicative of impermissible bias. *In re Antar (Antar II),* 71 F.3d 97 (3d Cir. 1995) (rev'd on other grounds). If there were a sliding scale of offensiveness, Judge Murphy's commentary is far more offensive than the comments in *Atar.*

Similarly, this Court concerns itself not only with actual bias, but the *appearance* of same. In *U.S. v Whitman,* 209 F.3d 619 (6th Cir. 2000), this Court remanded a criminal case for re-sentencing before a different trial judge because the trial court had improperly cited irrelevant acts of untruthful behavior as grounds for a sentencing enhancement. This Court found that the "trial court judge's lengthy harangue created the impression that the impartial administration of the law was not the judge's primary concern." *Id.* at 621. This Court stated that its reason for remanding to a different district court judge was because of the district court's "intemperate demeanor towards [] counsel." *Id.* at 624.

The *Whitman* Court cited *Anderson v Sheppard,* 856 F.2d 741 (6th Cir. 1988) with approval. In *Anderson,* the trial court became impatient with a change of counsel request after a reversal of a directed verdict. The trial judge stated that the

reversal put an "egg on [his] face" and that the case would have been "sent down the tubes by the jury." *Id.* at 743-745. This Court held that recusal is warranted "when the remarks of the judge during the course of a trial, or his manner of handling the trial, clearly indicate **a _hostility to one of the parties, or an unwarranted prejudgment of the merits of the case_**, or an alignment on the part of the Court with one of the parties for the purpose of furthering or supporting the contentions of such party, the judge indicates, whether consciously or not, a personal bias and prejudice which renders invalid any resulting judgment in favor of the party so favored." *Id* (emphasis added). This Court concluded that the trial judge's bias against and hostility toward appellant effectively denied appellant's right to a fair trial before an impartial tribunal." *Id. at* 741.

The general framework that emerges from the law regarding judicial bias is the notion that the appearance of justice is every bit as important as actual justice. This has long been a principle of our common law. Lord Hewart wrote that it is of "fundamental importance that justice should not only be done but should manifestly and undoubtedly be seen, to be done."[11] Judge Murphy's commentary was more egregious than the examples warranting reversal above. The words strike at the very

---

[11] *Rex v Sussex Justices; Ex parte McCarthy* [1924] 1 KB 257 at 259 per Lord Hewart CJ.

core of the criminal justice system – that lady justice is blind and the person in the black robe will ensure balance.

Here, Judge Murphy removed any credibility from this conviction when he admonished Liggins simply for exercising his right to a jury trial. Judge Murphy was "hostile" towards Liggins, to say the least, so much so that he clearly made an "unwarranted prejudgment about the case." That is not only evident from his words on January 30, 2020, when he told Liggins he looked like a criminal, but also even in his failed attempt at an apology on the first day of trial, in denying Liggins' recusal motion. Even then, with the benefit of time and reflection, the trial judge *still* could not get it right. He told Liggins that he must prove his innocence or prove his "lack of guilt." All of these comments give the impression "that the impartial administration of the law was not the judge's primary concern" (*Whitman,* at 621) and certainly gives a reasonable observer doubt about the judge's impartiality. *See Antar,* at 568.

Judge Murphy's credibility is further eroded by his total misrepresentation of the proceedings on January 30, 2020 hearing. In ruling on the motion to recuse, Judge Murphy stated that at the beginning of the hearing he "was fine" and did not hold the canceled trial "against Mr. Liggins." TT-I at PageID.1061. This is completely false. Virtually the first words out of Judge Murphy's mouth that day were "[m]ost defendants don't get my attention or stand out, but Mr. Liggins does."

ECF No. 80, Transcript of Motion Hearing January 20, 2020, at PageID.393. He moves right into unhinged anger.

Next, Judge Murphy states in justifying his decision not to recuse himself that "what happened next as I recall was that Mr. Liggins engaged in a personal colloquy with the Court [and asserted] that the government had been withholding evidence." TT-I at PageID.1062. This never happened. Judge Murphy went on for pages of transcripts before Liggins asked, politely and with deference, "Can I speak, your Honor?" ECF No. 80, Transcript of Motion Hearing January 20, 2020, at PageID.395. There was no colloquy before Judge Murphy looked at Liggins and told him he looked like a criminal. TT-I at PageID.396. But Judge Murphy says it was in response to Liggins' colloquy, which never happened, that he began to get upset and "engaged in the colloquy that's in the transcript…" TT-I at PageID.1062. That is *not* when he began to get upset.[12]

---

[12] Judge Murphy's record is suspicious when it comes to criminal defendants. Upon information and belief, in conversations with defense attorneys and prosecutors in the district, this is not the first time Judge Murphy has been unhinged and inappropriate in his lecturing of criminal defendants. This is corroborated by the fact that of the 51 compassionate release motions Judge Murphy received, he appears to have denied all of them. *See* LEXIS Analytics, *Stephen J. Murphy III* (May 17th, 2022) (The Lexis Nexis research tool is imperfect and the undersigned did his best to confirm this statistic. However, I leave room for the possibility that some opinions are missing.)

In *U.S. v. Wright,* 2020 U.S. Dist. LEXIS 198340 (2020), for example, the defendant spent considerable time in the hospital, including overnight stays, and had medical conditions including obesity, renal disease, peripheral vascular disease, and

This Court "reviews decisions denying [a] motion to recuse under the abuse of discretion standard." *United States v. Hartsel,* 199 F.3d 812 (6th Cir. 1999). It is an abuse of discretion where this Court "is left with the definite and firm conviction that the trial court committed a clear error of judgment." *Id.* at 674. To be sure, this was an abuse of discretion because Judge Murphy's commentary on both January 30, 2020 and October 19, 2021 were structural error denying Liggins a right to a fair trial because of judicial bias. It follows, *a fortiari,* that Judge Murphy's denial of the motion to recuse was an abuse of discretion because his analysis completely misstates what happened on January 30, 2020. One cannot exercise proper discretion if it is operating on a faulty premise. By definition, Judge Murphy's factually inaccurate analysis of his conduct is an abuse of discretion.

At his confirmation hearing in 2008, Judge Murphy stated:[13]

> I've striven to have that reputation as a federal prosecutor and I think that neutrality, detachment, fairness and moderation are the hallmark of a federal judge and should

---

amputated fingers and legs. The defendant also was on dialysis and used an electric wheelchair for mobility. Although serving a life sentence, Wright was terminally ill and living on month 30 of the 18 months doctors had given him to live. The man was dying and immobile. Judge Murphy denied him compassionate release. In *U.S. v. Taylor*, 2020 U.S. Dist. LEXIS 189117 (October 13, 2020), Judge Murphy found that the criminal defendant was at high risk of death from COVID-19, yet, despite finding substantial rehabilitation cutting against dangerousness, Judge Murphy decided to deny the motion.

[13]    https://www.c-span.org/video/?205228-1/raymond-kethledge-testifies-sixth-circuit-confirmation-hearing-2008

> I be confirmed but his committee those are the traits I
> would demonstrate in my daily work.

Judge Murphy failed in that effort here and this Court must remind him and all district courts of their duty. A trial judge "should be the exemplar of dignity and impartiality." *United States v Bray,* 546 F.2d 851, 859 (10th Cir. 1976). "He must exercise restraint over his conduct and statements in order to maintain an atmosphere of impartiality." *Id.* And, to be clear, "it is prejudicial error for the judge to make remarks that clearly import his feelings of hostility toward the defendant." *Id.*

### b. The trial judge's comments are structural error requiring automatic reversal.

Judicial bias is a structural defect, both when the bias is actual and when it is "merely unconstitutionally probable." *Coley v Bagley,* 706 F.3d 741, 750 (6th Cir. 2013). Further, "it is beyond dispute that judicial bias is structural error, not susceptible to forfeiture (or harmless error analysis). *See Washington v. Recuenco,* 548 U.S. 212, (2006); *see also Sullivan v. Louisiana,* 508 U.S. 275, 283 (1993).

As a threshold matter, Judge Murphy found that Liggins' motion to recuse was untimely. This is irrelevant since a waiver or forfeiture analysis does not apply to structural error. *See id.* Indeed, if the Court finds that Judge Murphy was biased – either in fact or in appearance – it must reverse Liggins' verdict. To the extent the Court engages in a balancing test as to whether or not there was bias at all, it should

not "stretch to characterize" Judge Murphy's comments as constitutionally acceptable. A trial judge who harbors animosity like this towards a criminal defendant, a trial judge who thinks the criminal defendant owes him proof that he's innocent, cannot be relied upon to rule on evidentiary issues (*see, e.g.,* the unlawful wiretap analysis below), nor can he be relied upon to give an actual, or the appearance of a, fair sentence.[14]

Structural error requires an automatic reversal. That should happen here, and the case should be assigned to a new judge.

## II. THE DISTRICT COURT ERRED IN DENYING A MOTION FOR NEW TRIAL BASED ON ADMISSION OF EVIDENCE DERIVED FROM AN ILLEGAL WIRETAP. ALTERNATIVELY, TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE THE ISSUE PRIOR TO TRIAL.

The government succinctly summarized the facts of this issue as follows:

> One of the government's witnesses, Luz Jiminez, was a target of a Title III investigation in the State of Arizona. The application for interceptions was not properly authorized by the appropriate state official. During the authorization period, Jiminez discussed Liggins's plan to send drug proceeds as well as a money seizure from Liggins's luggage. Because of the initial interceptions, law

---

[14] "The district court's failure to provide any reasoned explanation for the sentence it imposed undermines the public's confidence in the fairness of our criminal justice system. As the Supreme Court recognized in *Rita:* "Confidence in a judge's use of reason underlies the public's trust in the judicial institution. A public statement of those reasons helps provide the public with the assurance that creates that trust." *U.S. v. Vonner*, 516 F.3d 382, 405 (6th Cir. 2008) (citing *Rita*).

enforcement in Arizona knew to conduct surveillance of Jiminez at the Phoenix airport and seize Liggins's luggage. On one occasion, after the money seizure, Jiminez passed her phone to Liggins so he could talk to the individual Jiminez was speaking to. The calls were intercepted in October 2015.

Because the interceptions were not properly authorized, the government did not introduce them as evidence and put Liggins on notice of its intent not to do so.

ECF No. 115 at PageID.662.

### a. The new trial motion should have been granted, or an evidentiary hearing on the motion should have been ordered.

Liggins brought a timely motion for new trial under Fed. R. Crim. P. 33 on December 8, 2021. ECF No. 110 at PageID.649. In it, Liggins argued that there was an illegal wiretap surveilling one of the trial witnesses against him - Luz Jiminez – and that during the illegal wiretap, law enforcement discovers the connection between Liggins and Jiminez.[15] Liggins contended that this illegal wiretap ultimately led law enforcement to Murphy and Liggins. *Id.* at PageID.650-651. The government acknowledged that the interceptions of Jiminez's conversations "were not properly authorized." ECF No. 115 at PageID.662. Because the investigation stemmed from an illegal wiretap, Liggins asked the Court to vacate his conviction.

---

[15] The government will contend there was evidence of the Liggins-Jiminez connection in discovery. However, in the record before the Court, and in its response to the Rule 33 motion, no such proof exists.

The trial court denied the motion. ECF No. 117 at PageID.707. It first found that "because the motion is straightforward, the Court need not hold a hearing on the motion." *Id.* It then concluded that the illegal search was "too attenuated" from the evidence related to Murphy admitted at trial. *Id.* at PageID.708. The Court also concluded that Jiminez's testimony was proper because it, too, was "too attenuated" from the illegal wiretap. *Id.* at PageID.709.

The District Court was wrong. It should have (1) held an evidentiary hearing and (2) it should have vacated the conviction. This Court should order one of those two remedies. This Court should review the legal questions de novo because the trial court did not make factual findings at an evidentiary hearing. *United States v. Potter,* 927 F3d 446, 448 (6ᵗʰ Cir. 2019) (legal questions or mixed questions of law and fact subject to de novo review).

Fed. R. Civ. P. 33 provides that within 14 days (or three years for newly discovered evidence), a criminal defendant may motion a district court to "vacate any judgment and grant a new trial if the interest of justice so requires." Local practice rules provide that the District Courts in the Eastern District of Michigan "will hold a hearing on [new trial motions] unless the judge order submission and determination without hearing." E.D. Mich. L.R. 7.1(f)(2). Typically, an evidentiary hearing is "necessary to receive evidence of an issue of fact." *See, e.g., In re Searches and Seizures Conducted, Etc.,* 665 F.2d 775 (7ᵗʰ Cir. 1981); *United States*

*v. Smith*, 546 F.2d 1275 (5th Cir.1977). In any case, a district court has the power to order a new trial based on admission of illegally obtained evidence under the "interest of justice" standard. *United States v. Munoz,* 605 F.3d 359 (6th Cir. 2010).

The Court should have held an evidentiary hearing and/or granted the motion for new trial. To be sure, this Circuit has held that illegal wiretaps under Title III may lead to the suppression of the "fruits of any evidence obtained." *United States v Rice,* 478 F3d 704, 710 (6th Cir. 2007). This holding is consistent with that of our Supreme Court, which instructs that "no evidence derived" from "the contents of any wire or oral communications" that were obtained illegally may be used against a criminal defendant. *United States v Giordano,* 416 U.S. 505, 524 (1974).

The government acknowledges that the telephone surveillance of Jiminez was illegal under 18 U.S.C. §2510 *et seq.* (Title III). And the government acknowledges that it made use of that of that information by using it to "seize Liggins's luggage" and the funds inside. ECF No. 115 at PageID.662. The only question before the Court was whether or not this unlawfully obtained evidence, or the fruits of it, was, or were, used impermissibly at trial.

The trial court, agreeing with the government's response, denied the new trial motion, finding that "the evidence admitted at trial was too attenuated from any illegal search." ECF No. 117, at PageID.708. The trial court, without an evidentiary record, determined that a "credible source" had identified Murphy independent of

the illegal wiretap. The District Court concluded that this "broke the casual (sic) chain between the unauthorized wiretap and the evidence found on Dehaven Murphy." *Id.* It found similarly for Jiminez's testimony.

As a threshold matter, we do not know this, or anything, to be true because there was no evidentiary hearing. All we know is what was represented by the government's lawyers, which the trial judge apparently found to be "straightforward" enough to decide without a hearing. Are we to simply take the government's word about this credible source? Liggins urges there is nothing straightforward about an anonymous source of information mentioned in a pleading. An evidentiary hearing was required here because there were numerous issues of fact, including, but not limited to, how the government used the unlawfully obtained information, whether the government used the unlawful evidence to lean on its sources, and if there were any other independent sources of evidence tying Liggins to Jiminez and/or Murphy. We know none of this because the trial court denied Liggins a hearing. The Court should remand for this reason alone.

But even without a hearing, the trial court's conclusion, which blindly adopts the government's possession, badly misses the mark. The issue is not attenuation, the issue is whether the government admitted the fruits of an unlawful search. Based on the record as constituted, it absolutely did admit the fruits of unlawfully obtained evidence when it chose to put Jiminez on the stand. The only record evidence of a

connection between Liggins and Jiminez was the wiretap. And if the discovery of Jiminez's connection to Liggins was the wiretap, she should not have been permitted to testify. The Supreme Court in *Giordano,* cited by this Court in *Rice,* holds that no evidence derived from an illegal wiretap may be used by the government. Based on the trial record and the pleadings, there is no other reasonable conclusion about Jiminez's connection to Liggins other than the illegal wiretap. If that is the case, the issue is the direct use of inadmissible evidence, not attenuation.

The government candidly acknowledged in the record that Luz Jiminez's connection to Liggins was discovered on an illegal wiretap. ECF No. 115 at PageID.662. It is also undisputed that Luz Jiminez testified at trial. TT-III at PageID.1263. And her testimony was used both substantively to prove count one of the superseding indictment (conspiracy to distribute narcotics), and as corroboration for count two, aiding and abetting Murphy in distributing narcotics.

In fact, the government does not even shy away from what it learned illegally. Jiminez was asked and directly testified about the money she was supposed to pick up at the Phoenix airport in October of 2015. TT-III at PageID.1278-1280.[16] The only reason law enforcement knew that Jiminez was to pick up drug money at the

---

[16] This was no mistake, it was intentional. Prosecutors asked: "Okay. Ms. Jiminez, did you ever come to learn that people were -- law enforcement was listening to your calls at that time?" *Id.* at PageID.1281.

Phoenix airport in October of 2015 is because of wiretaps that "were intercepted in October 2015 . . .[that] were not properly authorized." ECF No. 115 at PageID.662.[17] The use of this evidence was not tangential to the case; the government directly asked the jury to find that this incident constituted a conspiracy to distribute narcotics. TT-V at 1591-92 ("you get to consider not just all [Liggins'] conduct during that time frame, but it includes Leron Liggins' agreement with those both known, like Ms. Murphy and like Luz Jiminez, but also – also those who are unknown as well"); *id.* at 1585 ("So that brings me to a point about cooperating witnesses because in this case you heard from two. You heard from Dehaven Murphy and you heard from Luz Jiminez, two women that were part of the agreement with Leron Liggins to possess with intent to distribute and to distribute drugs.")

---

[17] [Defense Counsel]: So at some point while you were living in Phoenix, the government had a wiretap on your phone, correct?

[Jiminez]: Yes.

[Defense counsel]: So they were listening to your live phone calls?

[Jiminez]: Yes.

*Id.* at PageID.1290

The government also used Jiminez's testimony to bolster the credibility of Murphy. TT-III at PageID.1283-1284 (Jiminez commenting on Liggins' discussing his friend getting caught in the Detroit airport); TT-V at PageID.1585 ("So then you as jurors need to ask yourselves, "How do I know that they came in here and they, in fact, told us the truth?," which I submit to you they did. Well, think about this. Dehaven Murphy and Luz Jiminez, they don't know each other, but when you think about their testimony, they corroborate one another. That's not just a really unfortunate or unlucky coincidence for Leron Liggins; that's truthful testimony lining up.").[18] In fact, during closing argument the government urged the jury to

_____

[18] *See also id* at 1585-86:

So then you as jurors need to ask yourselves, "How do I know that they came in here and they, in fact, told us the truth?," which I submit to you they did. Well, think about this. Dehaven Murphy and Luz Jiminez, they don't know each other, but when you think about their testimony, they corroborate one another. That's not just a really unfortunate or unlucky coincidence for Leron Liggins; that's truthful testimony lining up. So let's look at how their testimony corroborates one another and how their testimony lines up. Think about what Dehaven Murphy told you. She said as it relates to Leron Liggins, she -- he -- he is someone that she has known since high school. Well, what did Luz Jiminez tell you, Chata, what did she say? She told you that Leron Liggins got someone he grew up with to transport the bad heroin back. Well, what did Luz Jiminez tell you, Chata, what did she say? She told you that Leron Liggins got someone he grew up with to transport the bad heroin back. What else did Leron Liggins tell Luz Jiminez? He told her that because he'd known her, she wouldn't talk. That's what Leron Liggins thought. What did Dehaven Murphy tell you? She told you that she was taking the drugs to Leron Liggins who was out in Arizona. What did Luz Jiminez tell you? She said that the heroin was being returned to Liggins who was in Arizona at the time of the seizure back at the airport. What did Dehaven Murphy tell you? She'd never met Chata, but because she was around Leron Liggins, she heard him regularly talking on the phone with someone

consider the following with regard to convicting Liggins: "Dehaven Murphy and Luz Jiminez, they don't know each other, but when you think about their testimony, they corroborate one another." Trial Transcript, Volume 5, October 25, 2021, ECF No. 136 (hereinafter, "TT-V"), at PageID.1586. The government continued, "So let's look at how their testimony corroborates one another and how their testimony lines up.").

Even if this court reviews the trial court's denial of a new trial under an abuse of discretion standard, it should still be reversed. *United States v. Gaitan-Acevedo*, 148 F.3d 577, 589 (6th Cir. 1998). Under the "fruit of the poisonous tree" doctrine, "evidence unlawfully obtained, including all derivative evidence flowing from it, should be suppressed." *United States v. McClain,* 444 F.3d 556 (6th Cir. 2005). The exceptions to this doctrine are where "(1) the government learns of the evidence

---

named Chata. How does that make sense with what Luz Jiminez told you? She told you that Leron Liggins lived at his house at the time and that they got the heroin together. So that makes sense why Dehaven Murphy had heard Leron Liggins talking frequently on the phone to or about Chata. So think about how those women corroborate each other even they -- even though they don't really know one another. I also want you to think about Luz Jiminez's testimony on its own and how what she told you just makes sense. Think about it in relation to what Agent Hermans testified to based on his training and his experience investigating narcotics trafficking. Agent Hermans told you that a kilogram of heroin back in 2015 out of Arizona costs roughly $75,000. He also told you that it's very common with drug traffickers that they don't have to pay for their drugs up front. Larger amounts of drugs are fronted to a customer and then they pay it off with the proceeds that they've made from their sales later. Think about how that makes sense with what Luz Jiminez told you was happening here when she gave you that insider's perspective."

from an "independent source," *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392 (1920); (2) the connection with the unlawful search becomes "so attenuated as to dissipate the taint," *Nardone*, 308 U.S. at 341; or (3) the evidence "would inevitably have been discovered." *Nix v. Williams*, 467 U.S. 431, 444 (1984)."

In this case, there is no *record* to support an independent source or inevitable discovery argument. Rather, the government and trial court relied on the attenuation doctrine to deny Liggins' new trial motion. The test for attenuation is "whether the evidence sought to be introduced has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *United States v. Williams,* 615 F.3d 657, 660 (6th Cir. 2010).

At a minimum, the trial court erred in failing to order an evidentiary hearing because such are "necessary to receive evidence of an issue of fact." *See, e.g., In re Searches and Seizures Conducted, Etc.,* 665 F.2d 775 (7th Cir. 1981); *United States v. Smith,* 546 F.2d 1275 (5th Cir.1977); *United States v. Poe*, 462 F.2d 195 (5th Cir.1972), *cert. denied*, 414 U.S. 845, 94 S. Ct. 107, 38 L. Ed. 2d 83 (1973). Where a criminal defendant shows some contested facts, an evidentiary hearing should be ordered. Here, the briefs clearly indicate contested facts – Liggins contends the illegal wiretap was "clearly" the genesis for the entire case, where the government claims it was not. *See, generally,* ECF No. 110 and 112. Rather the hold a hearing to determine the credibility of witnesses on the facts, the Court instead made its own

factual determinations on attenuation, apparently just accepting as true the government's representations in briefing.

For example, the government writes: "In December 2015, law enforcement was tipped off by a 'credible source' that Dehaven Murphy would be flying with drugs to Phoenix. The evidence was not derived from the Arizona Title III interceptions . . ." ECF No. 112, at PageID.644. Are we supposed to just accept this assertion as true? How does one know whether law enforcement tapped its informants once they learned Liggins' name?

There are two inescapable record facts on this issue. First, Jiminez and Liggins were tied together by an illegal wiretap and the government made use of that information by inviting Jiminez to testify against Liggins. That is the fruit of a poisonous tree. Second, at a bare minimum, the issues described here begged for an evidentiary hearing. Thus, the Court should either reverse or remand for a hearing.

### b. In the alternative, trial counsel was ineffective for not filing a motion to suppress and requesting an evidentiary hearing.

To the extent this Court finds that it cannot reverse based on the Rule 33 motion, then defense counsel was constitutionally ineffective for failing to raise the issue in a motion to suppress prior to trial and requesting an evidentiary hearing. This Court should find that the ineffective performance is apparent from the record.[19]

---

[19] Liggins is conscious of the fact that this Court "generally do[es] not rule on ineffective assistance of counsel claims raised for the first time on direct review"

The failure to file a motion to suppress "may amount to ineffective assistance of counsel . . ." *Kimmelman v. Morrison,* 477 U.S. 365, 375 (1986). "To demonstrate ineffective assistance of counsel based on failure to file a motion to suppress, a petitioner must show that counsel's failure fell below an objective standard of reasonableness." *Id.* And, a "petitioner must demonstrate that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the outcome would have been different absent the excludable evidence." *Williams v. United States*, 632 F. App'x 816, 821 (6th Cir. 2015) (citing *Kimmelman*, at 375); *see also Strickland v Washington,* 466 U.S. 668 (1984) (familiar standard for ineffective assistance of counsel).

According to the government, the information related to the surveillance of Jiminez was produced to counsel for Liggins prior to trial. ECF No. 115, at PageID.662-663. In fact, it is clear it was disclosed prior to trial, as the government mentions the improper surveillance in its trial brief on October 12, 2021, a week before trial. ECF No. 88, at PageID.443-444 ("one of the government's witnesses, Luz Jiminez, was a target of a Title III investigation in the State of Arizona. The application for interceptions was not properly authorized . . ."). The government also

---

unless the "record is adequately developed to allow the reviewing court to assess the merits of the appellant's *Strickland* claim." *United States v. Frazier,* 423 F.3d 526, 539 (6th Cir. 2005). Should the Court find the record is not ripe to assess the merits, it should expressly leave open the possibility for collateral review later.

stated its intention to argue attenuation in its trial brief. *Id.* ("the [testimony about Phoenix] is attenuated and therefore admissible."). The information was produced at a late hour, as Liggins himself expressed doubts that the government had produced this information since at least 2019. *See, e.g.,* ECF No. 31 at PageID.146.

Ineffective assistance "can flow from a failure to file a plainly meritorious motion to suppress." *Hendrix v. Palmer*, 893 F.3d 906, 922 (6th Cir. 2018). This Court held in *Hendrix* that the test for such a failure is whether "the meritorious nature of the motion must be so plain that no competent attorney would think a motion to suppress would have failed." *Id.* On top of this, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'" *Strickland*, 466 U.S. at 691.

It would be difficult to find a case where the merit of a motion is any plainer. The government concedes that the evidence was unlawful. While the government does take the position that Jiminez's testimony is attenuated, there is no dispute that there was unlawfully obtained evidence related to Liggins. Counsel could have investigated this issue far earlier or asked to continue the trial.

What is not known based on the record is the extent to which the government relied on the unlawfully obtained evidence to further its investigation. In other words, another reason the failure to bring a motion to suppress is constitutionally deficient is because defense counsel did not request an evidentiary hearing prior to

trial to determine the merits. Counsel's failure to address these issues prior to trial, which would have allowed him to preclude Jiminez's testimony altogether, constitutes the ineffective assistance of counsel.

At a minimum, this Court should remand for an evidentiary hearing based on what is a clear "need for a more fully developed record on the issue." *McCorkle v United States,* ___ F App'x ___ (6th Cir. November 6, 2012) (remanding matter for evidentiary hearing on ineffective assistance).

### III. THE TRIAL COURT VIOLATED DEFENDANT'S FAIR TRIAL RIGHTS WHEN IT PRECLUDED TRIAL COUNSEL FROM QUESTIOING A WITNESS ABOUT ANOTHER WITRESS'S MOTIVATION TO LIE.

Liggins was denied a fair trial when the trial court prevented his counsel from arguing in closing argument that a cooperating witness had firearms in her home, which subjected her to enhanced criminal liability. It is always relevant and proper to attempt to show a witness's motivation to lie.

More specifically, trial counsel asked the following of Agent Hermans during cross-examination:

> [Defense counsel]: And there was a search warrant executed at [Jiminez's] home [] where there was guns and he was there and she was there, is that correct?
>
> [Agent Hermans]: I don't know if she – it was her house. I know – is it – it's the postal?
>
> ***

[Prosecutor]: Judge, I'd like to object to relevance and I would like to approach

[The Court]: Let's get this over with. It's -- we're going into more depth I think than -- than is appropriate. If you'd like to ask anything directly about the investigation that he learned with Jiminez as a means of impeaching, go -- go ahead, Mr. Crandall.

[Defense counsel]: Straight and simple. 18 USC Section 924(c) is a great enhancement on guns, is that correct? 924(c) is the gun count –

[Agent Hermans]: Are -- are you asking if she should have been or he should have been enhanced?

[Defense counsel]: No. I'm just asking you is 924(c) a very -- very –

[Agent Hermans]:. I know 924(c) --

[Defense counsel]: -- difficult –

***

[Defense counsel]: Is 924(c) a very difficult enhancement for a defendant, is that correct?

[Agent Hermans]: Yes.

[Defense counsel]: 'Cuz it adds mandatory minimums of five, 10, 15, 20, 25 years, correct?

[Agent Hermans]: Yes.

[Defense counsel]: And if guns were found in her house, she was exposed to that too?

[Agent Hermans]: Yes.

[Defense counsel]: Drug trade with a gun?

[Prosecutor]: Objection to speculation . . . and relevance.

[The Court]: …That's going to be sustained.

TT-IV at PageID.1536-1538. Later, the prosecutor asked that the trial judge preclude defense counsel from mentioning this testimony during closing argument. *Id.* at PageID.1560-1561. The trial court did preclude such argument. *Id.*

Prohibiting certain arguments in closing can deny a criminal defendant a fair trial under the Sixth Amendment. *Herrin v. New York,* 422 U.S. 853 (1975). "It can hardly be questioned that closing argument serves to sharpen and clarify the issues for resolution by the trier of fact in a criminal case." *Id.*

The trial court prohibited argument on plainly relevant evidence. "[J]urors are entitled to have the benefit of the defense theory before the so they could make an informed judgment as to the weight to place on [testimony] which provided 'a crucial link in the proof . . . of [Liggins'] act." *Davis v. Alaska,* 415 U.S. 308 (1974). Indeed, "revealing possible biases, prejudices, or ulterior motives of the witness" should be permitted. *Id.* at 316.

To be sure, *Davis* was a confrontation clause case. But it is axiomatic that motivations to lie in a criminal case are highly relevant. In federal law, 18 U.S.C. 924(c) provides for serious mandatory incarceration when conduct combines guns and drugs. Jiminez was not incarcerated because of her cooperation with the

government. The credibility of Jiminez was of critical importance in this case. *See, supra,* at Section II (government's closing argument intertwining Jiminez and Murphy to corroborate each other). A fair trial required Liggins be able to explore relevant motivations to lie. The trial judge's preclusion of that argument after it was elicited during trial denied a Liggins a fair trial because it denied him the fundamental right to explore a witness's motivation to lie.

IV.    **THE ADMISSION OF STATEMENTS MADE BY MURPHY ON INSTAGRAM WAS ERROR BECAUSE THE STATEMENTS WERE HEARSAY.**

The government admitted messages between Liggins and Murphy from the social media platform Instagram. TT-II at PageID.1182, Exhibit 14. The Exhibit contains Murphy's responses to Liggins, which are plainly hearsay. In fact, the government concedes as much in its trial brief, writing that "some of [the] individual responses to Liggins's statements, as categorized below, could be hearsay." ECF No. 88, at PageID.435.

There was no objection to the admission of the messages, so this Court reviews for plain error. A plain error inquiry asks "whether (1) there was an error, (2) which was plain, (3) that affected the defendant's substantial rights, and (4) that, in our discretionary view, seriously affects the fundamental fairness, integrity, or public reputation of judicial proceedings." *United States v. Trammel,* 404 F.3d 397, 399 (6th Cir. 2005).

Among others, Murphy tells Liggins in these messages, "I might be going to jail cuz of u and u left me hanging," "U got me in this bullshit and then left me hangin," "U just tired to make up a whole lie…," and "You see this shit I'm the only person in trouble." These messages are plainly hearsay without an exception. They are statements that certainly go to the truth of whether Liggins was involved in a conspiracy or in aiding and abetting Murphy. *See* Fed. R. Evid. 801, 802, 803, and 804.

The government's arguments that they are merely contextual, or co-conspirator statements, are incorrect. First, a social media "message does not lose its hearsay nature simply by [the witness] testifying at trial that he indeed sent the message." *Waers v. Embassy Healthcare,* 2022 U.S. Dist. LEXIS 150808 (S.D. Ohio, August 22, 2022). Second, defense counsel is unaware of any "questions or commands" or "context" exceptions to the hearsay rule. *See* ECF No. 88 (Government's Trial Brief), at PageID.435.

The government was required to prove that Liggins was involved with Murphy. Hearsay statements which clearly go to the truth of that fact affect substantial rights because these messages unfairly corroborated and bolstered Murphy's testimony.[20] Indeed, the government then makes use of these messages at

---

[20] Whether or not it was ineffective to fail to object to the admission of this exhibit is not ripe for direct review in our view.

closing argument when it says, "notice something about his exchanges on Instagram. They've very similar to his recorded phone calls with [Murphy], constantly calling her Bro. So you can see the similarity from what he says when he's recorded with his own written words." TT-V at PageID.1584. Clearly the government felt these messages were substantial to its case.

## V.    IF THE COURT GRANTS RELIEF OF ANY KIND, IT SHOULD REMAND TO A DIFFERENT TRIAL JUDGE.

This Court has the authority to remand to a different trial judge. *Armco, Inc. v. United Steelworkers,* 280 F.3d 669, 683 (6th Cir. 2022); *see also* 28 U.S.C. § 2106. The factors this Court considers are "(1) whether the original judge would reasonably be expected to have substantial difficulty in putting out of his mind previously expressed views or findings; (2) whether reassignment is advisable to preserve the appearance of justice; and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness." *Smith v. United States,* 348 F.3d 545, 554 (6th Cir. 2003).

Based on the arguments made in Subsection I of this Brief on Appeal, a different trial judge is required for the appearance of (and actual) justice. Nothing about remand to a different trial judge would entail "waste or duplication," but would in fact help cleanse the previous regrettable statements made here.

## CONCLUSION

For the foregoing reasons, this Court should reverse and remand consistent with the discussion and argument in this brief.

Respectfully Submitted,

WADE FINK LAW, P.C.

/s/ Wade G. Fink (P78751)
550 W. Merrill St, Suite 100
Birmingham, MI 48009
248-712-1054
wade@wadefinklaw.com
*Attorneys for Leron Liggins*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rules 32(a)(7) and (g) of the Federal Rules of Appellate Procedure, the undersigned certifies that this brief complies with the type-volume limitation and contains no more than 13,000 words. This brief contains 11,701 words in 14 point proportionally-spaced font, Times New Roman, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7).

/s/ Wade G. Fink
Attorney for Leron Liggins

## CERTIFICATE OF SERVICE

I hereby certify that on this September 14, 2022, a copy of the foregoing Brief of Defendant-Appellant, was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's system.

/s/ Wade G. Fink
Attorney for Leron Liggins

## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

| Description of Entry | Record No. | Page ID |
|---|---|---|
| Indictment | 1 | 1-3 |
| Attorney Appearance | 10 | 14-15 |
| Order Denying Motion to Produce | 31 | 146-150 |
| Request to Terminate | 33 | 157 |
| Brief on Request to Terminate | 34 | 158-159 |
| Motion to Withdraw as Counsel | 35 | 161-165 |
| Superseding Indictment | 42 | 180-183 |
| Motion | 51 | 222-225 |
| Motion to Withdraw as Counsel | 52 | 226-228 |
| Supplement to Motion to Withdraw | 54 | 242-245 |
| Order | 56 | 250-252 |

| | | |
|---|---|---|
| Appearance of Attorney | 71 | 354-355 |
| Order Granting Delay | 75 | 380 |
| Transcript of Motion Hearing on January 20, 2022 | 80 | 390-399 |
| Motion for Discovery | 85 | 423-425 |
| Government Trial Brief | 88 | 432-437 |
| Motion to File Late Response | 91 | 460-462 |
| Motion to Recuse | 94 | 470-473 |
| Exhibit – Transcript from January 30, 2022 | 94-1 | Illegible |
| Motion for New Trial | 110 | 649-653 |
| Response to New Trial Motion | 115 | 662-668 |
| Order Denying New Trial Motion | 117 | 707-710 |
| Judgment | 124 | 790-796 |
| Trial Transcript Vol. 1 | 132 | 878-1073 |
| Trial Transcript Vol. 2 | 133 | 1074-1212 |
| Trial Transcript Vol. 3 | 134 | 1213-1403 |
| Trial Transcript Vol. 4 | 135 | 1404-1564 |
| Trial Transcript Vol. 5 | 136 | 1565-1671 |
| Sentencing Transcript | 137 | 1672-1700 |