## No. 22-1236

In the United States Court of Appeals
for the Sixth Circuit

————————

# United States of America,

Plaintiff-Appellee,

v.

# Leron Liggins,

Defendant-Appellant.

————————

On Appeal from the United States District Court
for the Eastern District of Michigan
No. 2:18-cr-20071 (Hon. Stephen J. Murphy, III)

————————

## Brief for the United States

————————

Dawn N. Ison
United States Attorney

Erin S. Shaw
Assistant United States Attorney
Eastern District of Michigan
211 West Fort Street, Suite 2001
Detroit, MI 48226
(313) 226-9182
erin.shaw@usdoj.gov

# Table of Contents

Table of Authorities........................................................................ iii

Oral Argument Is Unnecessary ...........................................................vii

Introduction................................................................................... 1

Issues Presented............................................................................. 4

Statement of the Case ..................................................................... 6

A.    Liggins sends suitcases full of money and drugs to airports all over the country. .........................................................6

B.    Liggins fires three attorneys, walks back his commitment to plead guilty in two different cases, and moves for recusal of the judge the night before trial. .................................. 10

C.    The jury convicts Liggins. ...........................................15

D.    The district court denies Liggins's motion for new trial and sentences him at the bottom of the guidelines. ...........................17

Summary of the Argument ...................................................21

Argument.......................................................................23

I.     The district court did not abuse its discretion in denying Liggins's last-minute motion for recusal based on isolated comments from almost two years earlier.....................................23

II.    Liggins is not entitled to a new trial based on his post-trial suppression arguments. .............................................35

        A.    Dehaven Murphy was caught because of a tip—not because of the Jiminez wiretap............................38

        B.    The 2021 trial testimony was sufficiently attenuated from the 2015 wiretap.........................................45

III.   The district court did not plainly err in admitting Murphy's responses to Liggins on Instagram. ...............................50

IV.   The district court did not violate Liggins's trial rights by forbidding either side from discussing guns during summation. .....................................................................56

V.   Liggins's ineffective-assistance-of-counsel claims should be left for another day ..........................................................62

Conclusion ......................................................................63

Certificate of Compliance with Rule 32(a) ...........................64

Certificate of Service ..........................................................65

Relevant District Court Documents.......................................66

# Table of Authorities

**Cases**

*Burley v. Gagacki*, 834 F.3d 606 (6th Cir. 2016) ...................................... 23

*Davis v. Alaska*, 415 U.S. 308 (1974) ................................................ 60, 61

*Herring v. New York*, 422 U.S. 853 (1975) ............................................. 60

*Hudson v. Michigan*, 547 U.S. 586 (2006) ........................................ 38, 45

*Keilholtz v. United States*, No. 22-5103, 2022 WL 3221935
    (6th Cir. July 21, 2022) .................................................................... 41

*Liteky v. United States*, 510 U.S. 540 (1994) ................................. passim

*Matter of Searches & Seizures Conducted on Oct. 2, & 3, 1980*,
    665 F.2d 775 (7th Cir. 1981) .......................................................... 43

*Puckett v. United States*, 556 U.S. 129 (2009) ........................... 42, 51, 58

*Segura v. United States*, 468 U.S. 796 (1984) ......................................... 45

*U.S. ex rel. Williams v. Renal Care Grp., Inc.*,
    696 F.3d 518 (6th Cir. 2012) ..................................................... 33, 34

*United States v. Adams*, 722 F.3d 788 (6th Cir. 2013) ........................... 24

*United States v. Akridge*, 346 F.3d 618 (6th Cir. 2003) ................... 47, 49

*United States v. Anderson*, 76 F.3d 685 (6th Cir. 1996) ........................ 43

*United States v. Antar*, 53 F.3d 568 (3d Cir. 1995) ................................ 28

*United States v. Bankston*, 820 F.3d 215 (6th Cir. 2016) ...................... 35

*United States v. Blood*, 435 F.3d 612 (6th Cir. 2006) ............................ 29

*United States v. Ceccolini,* 435 U.S. 268 (1978) .............................. passim

## Cases

*United States v. Chavez*, 951 F.3d 349 (6th Cir. 2020)...........................56

*United States v. Clariot*, 655 F.3d 550 (6th Cir. 2011)....................38, 44

*United States v. Cromer*, 389 F.3d 662 (6th Cir. 2004) ........................27

*United States v. Dandy*, 998 F.2d 1344 (6th Cir. 1993)...................24, 54

*United States v. Davis,* 15 F.3d 526 (6th Cir. 1994) ...............................36

*United States v. Dominguez Benitez,* 542 U.S. 74 (2004) .......................51

*United States v. Dunnican*, 961 F.3d 859 (6th Cir. 2020) ...............37, 52

*United States v. Elmore*, 18 F.4th 193 (6th Cir. 2021) ...........................45

*United States v. Evans*, 883 F.2d 496 (6th Cir. 1989) ...........................54

*United States v. Farmer*, 38 F.4th 591 (7th Cir. 2022)...........................36

*United States v. Figueredo-Diaz*, 718 F.3d 568
    (6th Cir. 2013) ........................................................... 38, 39, 41, 44

*United States v. Giordano*, 416 U.S. 505 (1974)....................................46

*United States v. Gray*, 491 F.3d 138 (4th Cir. 2007) .............................47

*United States v. Harrison,* ___ F.4th ___, No. 21-6146,
    2022 WL 17348750 (6th Cir. Dec. 1, 2022) .............................52, 53

*United States v. Henderson,* 626 F.3d 326 (6th Cir. 2010) ....................52

*United States v. Hickman*, 592 F.2d 931 (6th Cir. 1979) .......................59

*United States v. Hynes*, 467 F.3d 951 (6th Cir. 2006) ...........................59

*United States v. Jacob,* 377 F.3d 573 (6th Cir. 2004)......................52, 54

*United States v. Leonardi*, 623 F.2d 746 (2d Cir. 1980) ........................48

iv

## Cases

*United States v. Marcus*, 560 U.S. 258 (2010) ........................................ 51

*United States v. Morrow*, 977 F.2d 222 (6th Cir. 1992) .......................... 29

*United States v. Munoz*, 605 F.3d 359 (6th Cir. 2010) .................... 36, 37

*United States v. Musaibli*, No. 22-1013, 2022 WL 4138327
    (6th Cir. Sept. 13, 2022) ........................................................ 25, 33

*United States v. Nelson*, 922 F.2d 311 (6th Cir. 1990) ........................... 24

*United States v. Obiukwu*, 17 F.3d 816 (6th Cir. 1994) ................. 35, 36

*United States v. O'Dell*, 805 F.2d 637 (6th Cir. 1986) ..................... 42, 43

*United States v. Oldfield*, 859 F.2d 392 (6th Cir. 1988) ....................... 36

*United States v. Pierce*, 62 F.3d 818 (6th Cir. 1995) ........................ 36, 37

*United States v. Rice*, 478 F.3d 704 (6th Cir. 2007) .............................. 46

*United States v. Rodriguez-Lopez*, 565 F.3d 312 (6th Cir. 2009) ..... 51, 53

*United States v. Sachs*, 801 F.2d 839 (6th Cir. 1986) ............................ 36

*United States v. Sands*, 815 F.3d 1057 (7th Cir. 2015) ......................... 36

*United States v. Smith*, 546 F.2d 1275 (5th Cir. 1977) ......................... 43

*United States v. Smith*, 749 F.3d 465 (6th Cir. 2014) ..................... 42, 43

*United States v. Smith*, 928 F.2d 740 (6th Cir. 1991) ........................... 29

*United States v. Soto*, 794 F.3d 635 (6th Cir. 2015) .............................. 37

*United States v. Stark*, 758 F. App'x 518 (6th Cir. 2019) ...................... 41

*United States v. Sweets*, 526 F.3d 122 (4th Cir. 2007) .......................... 47

## Cases

*United States v. Tucker*, 90 F.3d 1135 (6th Cir. 1996) ........................... 62

*United States v. VanDemark*, 39 F.4th 318 (6th Cir. 2022) .................. 45

*United States v. Wac*, 498 F.2d 1227 (6th Cir. 1974)............................. 46

*United States v. White*, 746 F.2d 426 (8th Cir. 1984) ............................ 48

*United States v. Williams*, 615 F.3d 657 (6th Cir. 2010)................. 46, 47

*United States v. Woods*, 711 F.3d 737 (6th Cir. 2013)........................... 37

*United States v. Wright*, 343 F.3d 849 (6th Cir. 2003) .......................... 51

*Utah v. Strieff*, 579 U.S. 232 (2016) ...................................................... 44

## Statutes

18 U.S.C. § 924(c) ............................................................................ passim

28 U.S.C. § 2255 ...................................................................................... 63

## Rules

Fed. R. Crim. P. 12(b)(3) ........................................................................ 35

Fed. R. Crim. P. 12(c) .............................................................................. 35

Fed. R. Crim. P. 33(a)............................................................................... 36

Fed. R. Evid. 801(a) ................................................................................. 51

Fed. R. Evid. 801(d)........................................................................... 50, 52

## Oral Argument Is Unnecessary

This is an appeal following a short jury trial. Because the defendant's arguments are foreclosed by precedent, the record, and the deferential standards of review, oral argument is unnecessary.

# Introduction

The same month his parole was terminated for armed robbery, Leron Liggins sent almost $37,000 to Phoenix in his checked luggage to repay a drug debt. A month and a half later, one of his couriers was arrested at the Detroit airport with over 330 grams of heroin in her checked suitcase. The following Christmas, TSA agents in Louisville caught Liggins with a checked roller bag full of tramadol—a cutting agent and Schedule IV controlled substance in its own right. Given that evidence, it did not take the jury very long to convict Liggins of drug offenses here, and this Court should affirm.

First, the district court's intemperate comments at a pretrial hearing did not require recusal on the morning of trial two years later. The district court's frustrations were well justified by Liggins's conduct—most notably, Liggins's repeated attempts to delay the proceedings by firing his attorneys and strategically flip-flopping on whether he intended to plead guilty. And although the district court should have chosen its words more carefully, none of the challenged comments occurred before the jury, and the record establishes that the

district court treated Liggins fairly throughout trial and sentencing. Thus, as is "ordinarily" the case, the "hostile" judicial remarks at the pretrial hearing did "not support a bias or partiality challenge," because they did not "reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555 (1994).

Liggins's belated suppression argument concerning a state wiretap targeting his testifying co-conspirator, Luz Jiminez, faces similar obstacles. For one thing, Liggins has never demonstrated good cause for failing to raise this argument before trial. And although the government ultimately agreed to self-suppress the wiretap's contents, none of the trial evidence was so closely derived from the wiretap as to justify suppression. Dehaven Murphy—the courier arrested at the Detroit airport with Liggins's heroin in her luggage—was "caught because of a tip," not because of the wiretap. Moreover, she and Jiminez each testified of their own free-will, six years after the wiretap. The Supreme Court has long admonished courts to be wary of excluding free-will testimony of live witnesses. *United States v. Ceccolini,* 435 U.S.

268, 279 (1978). The district court did not abuse its discretion when it followed that precedent, and denied Liggins's motion for new trial.

Liggins failed to raise his remaining appellate arguments below, and he cannot establish plain error—or any error at all. The district court properly admitted Murphy's responses to Liggins on Instagram because they provided context for Liggins's own party admissions. And the district court did not violate Liggins's trial rights when it prohibited both sides from commenting about some uncharged guns that the police recovered from a house where Liggins was present.

The judgment should be affirmed.

3

# Issues Presented

I.    *Recusal.* Liggins filed a motion for recusal the night before trial started, based on isolated comments made nearly two years prior. Did the district court act within its discretion in denying the motion?

II.    *Motion for New Trial.* Liggins filed a motion for a new trial based on his post-trial claim that evidence should have been suppressed, when that evidence was not causally connected to the improperly authorized wiretap, or else was the product of the testifying witness's own free will. Did the district court properly deny the motion?

III.    *Hearsay.* Liggins did not object to the admission of Murphy's responses to Liggins on Instagram that provided context for Liggins's party admissions. Did the district court commit plain error when it admitted them into evidence?

IV.    *Limitation on Closing Argument.* Liggins—and not Jiminez—was present when police seized guns while executing a search warrant in an unrelated case at her house. Did the district court commit plain error when it prohibited both parties from discussing these guns during closing argument?

4

V.    *Ineffective Assistance.* Should the Court review Liggins's various ineffective-assistance claims on direct appeal, or should it follow the usual practice and require Liggins to raise them on collateral review?

# Statement of the Case

**A.    Liggins sends suitcases full of money and drugs to airports all over the country.**

Liggins ran a cross-country heroin business.

Sometimes, he used couriers, like his friend from high school, Dehaven Murphy. (R.133: Tr., 1147, 1149, 1153, 1204). In December 2015, ATF in Detroit got a tip that Murphy was scheduled to fly from Detroit to Phoenix on American Airlines the next day, and was believed to have 300 grams of heroin. (R.116-5: Ex., 704). Investigators pulled her checked suitcase from the plane's hold, and a drug detection dog alerted positively on it. (R.133: Tr., 1117, 1123). When confronted with this information, she gave investigators consent to search it. (*Id.*, 1124, 1154). Her bag contained over 330 grams of heroin, wrapped tightly in plastic wrap, and hidden in towels. (*Id.*, 1127, 1136, 1145, 1146). Murphy was arrested. (*Id.*, 1129, 1155).

She admitted "taking the bag because [Liggins] told [her she] could make some money if [she] dropped the bag off in Arizona." (*Id.*, 1149). Another co-conspirator confirmed that Liggins was trying to

"return" this batch of heroin because it was "no good," and "nobody wanted to pay for it." (R.134: Tr., 1284–85).

Liggins similarly paid Murphy $1,000 or $1,500 to fly with a checked duffel bag to California around Thanksgiving. (R.133: Tr., 1166–69). Murphy believed that it contained money. (*Id*., 1166). Once in California, Murphy saw Liggins exchange that same duffel bag with a man at a hotel. (*Id*., 1168). She would pick up or drop off people, money, and phones when Liggins asked, too. (*Id*., 1174).

Murphy decided to work with law enforcement. As part of her cooperation, she made several recorded phone calls with Liggins. (R.133: Tr., 1158–62, 1165, 1176–78, 1188–89; Gov. Exs. 9–11 (audio recordings) (on file with the Sixth Circuit clerk's office)). Liggins told Murphy that it was his fault that she was caught, because he should have told her to fly either very early in the morning or very late at night. (Gov. Ex. 10). He was concerned that he was in the same boat that she was, because she had all of his information, so he told her to delete her social media and change her phone number. (Gov. Exs. 9–11). He told her that they had a lawyer for her. (Gov. Exs. 9, 10). He asked her the names of the officers, and what they asked her—including

7

whether she gave them any names. (Gov. Exs. 10, 11). He even hung up on her at one point, worried that he was being recorded. (*Id.*).

In an effort to send "money and drugs" cross-country and avoid "get[ting] caught," Liggins was also fond of the "check and miss" technique—where drug dealers "check in the bag and they don't get on the airplane." (R.134: Tr., 1280). Then, when the bag arrives on the carousel at the destination airport, someone else comes to collect the bag on the drug dealer's behalf.

Almost as soon as Liggins was released from parole after serving a substantial prison sentence for robbing a McDonald's with a sawed-off shotgun, (R.118: PSR, 724 (¶45)), he was checking and missing. The same month his parole was terminated, Liggins bought himself a plane ticket from Detroit to Phoenix, sent almost $37,000 cash in his checked luggage, and then didn't board the flight. (R.134: Tr., 1228, 1255). Investigators at the Phoenix airport saw a woman retrieve Liggins's suitcase from the baggage carousel, look around seeming "nervous," and then abandon Liggins's bag and walk out of the terminal. (*Id.*, 1228–30). They collected the luggage, obtained a warrant to search it, and seized the money inside. (*Id.*, 1231–33, 1253–55).

8

Liggins called the airport looking for his suitcase. (*Id.*, 1235). When his call was transferred to the police sergeant supervising the seizure, Liggins hung up. (*Id.*, 1237). Liggins then arrived in Phoenix the following day. (*Id.*, 1256). He agreed to speak to investigators at the airport about his seized bag. Liggins admitted packing it, putting it on the flight, and missing the flight. (*Id.*, 1257). Liggins also allowed investigators to search the two pieces of checked luggage that he brought from Detroit. (*Id.*, 1258). One suitcase contained nothing but 14 or 15 towels. (*Id.*, 1258–59).

About a year after Murphy was caught, officials at the Louisville, Kentucky airport detected a white powdery substance, packed with towels, in Liggins's checked luggage during the baggage-screening process. (*Id.*, 1334, 1345). At first, they thought it was cocaine. (*Id.*, 1337). But it turned out to be tramadol. (*Id.*). Tramadol is a Schedule IV narcotic commonly used as a cutting agent. (*Id.*, 1337, 1365). Liggins admitted that he paid cash for his plane ticket and packed his own bag. (*Id.*, 1343–44). Along with his personal iPhone and tablet, Liggins was carrying four additional flip phones, over $8,300 cash, and yet more towels. (*Id.*, 1345–46).

9

**B.    Liggins fires three attorneys, walks back his commitment to plead guilty in two different cases, and moves for recusal of the judge the night before trial.**

In early 2018, a grand jury in the Eastern District of Michigan indicted Liggins for a drug conspiracy. (R.1: Indictment, 1). He retained attorney Marlon Evans. (R.10: Appearance, 14).

At the time of his arrest in Detroit, Liggins had already been indicted in the Western District of Kentucky for drug charges stemming from the seizure at the Louisville airport. (18-20182: R.1: Consent to Transfer, 9). Mr. Evans represented Liggins in the Kentucky case too. (*Id.*, 10). With Mr. Evans's help, Liggins requested a Rule 20 transfer so that his Kentucky case could be transferred to Michigan for guilty plea and sentencing. (*Id.*, 1). Liggins's request was approved, and the order to transfer his case was entered. (*Id.*). Liggins's transferred case (18-20182) was ultimately assigned to the same judge in the Eastern District of Michigan as Liggins's conspiracy case (18-20071). (18-20182: R.7: Reassignment Order, 25). Mr. Evans continued to represent Liggins in both matters.

But when the time came, Liggins declined to go through with his guilty plea in the transferred Kentucky case. Instead, he requested

several adjournments to explore a global resolution of both matters. (R.19: Stipulation, 41; R.20: Stipulation, 46; R.21: Stipulation, 52; R.28: Stipulation, 137; R.32: Stipulation, 152). To help Liggins weigh his options, the district court granted Liggins's "unusual" request to order the probation department to prepare a preliminary presentence report. (R.128: Tr., 818). But even after he got his report, Liggins was still equivocating.

Then Liggins sent handwritten documents to the district court seeking to terminate Mr. Evans. (R.33: Letter, 157: R.34: Letter, 158). Mr. Evans filed a motion to withdraw as counsel. (R.35: Motion, 161). The district court granted the motion, and Joseph R. Arnone was appointed from the CJA panel to represent Liggins. (R.38: Order, 169–70; R.39: Appointment Order, 171; R.129: Tr., 3–7).

After Mr. Arnone requested more time to go over the discovery with Liggins, the case was set for trial in September 2019. (R.127: Tr., 805–06; R.40: Order, 177). At the final pretrial conference in early September, Liggins rejected the government's plea offer and requested to proceed to trial. (R.130: Tr., 836–37). Around a week later, however, Liggins changed course and indicated his intent to plead guilty. (R.49:

11

Stipulation, 217). Based on Liggins's representations, the trial was cancelled, and a change of plea hearing was scheduled for what would have been the first day of trial. (*Id.*). In anticipation of his guilty pleas, Liggins was arraigned on a superseding information in the Kentucky case (correcting the drug-type as tramadol), and also on a superseding indictment in the Michigan case. (R.47: Audio file of arraignments; R.48: Acknowledgment, 215; R.42: First Superseding Indictment, 180–82).

But Liggins again reversed course, and did not plead guilty as scheduled. (R.49: Stipulation, 217). Then, he sent more handwritten documents to the district court, this time seeking to terminate Mr. Arnone. (R.51: Letter, 222–23). Like his predecessor, Mr. Arnone also moved to withdraw. (R.52: Motion, 226–27). Mr. Arnone referenced Liggins's about-face on pleading guilty. (*Id.*, 226). Mr. Arnone also explained that Liggins appeared to believe that Mr. Arnone was colluding with the prosecutors, and "asked that Mr. Arnone Subpoena information not discoverable under Rule 16." (*Id.*, 226–27).

At the hearing on Mr. Arnone's motion to withdraw, the district court voiced concern over Liggins's pattern of problems working with

counsel. The judge explained his own experiences with attorneys Evans and Arnone, noting that "we're talking about two of the very finer lawyers in the district." (R.80: Tr., 394). But Liggins "apparently couldn't get along" with Mr. Evans and now also "complains about the performance of Arnone." (*Id.*, 393, 395).

The district court was also upset about being "misled" by Liggins and "getting the runaround" from him—because Liggins kept reversing course about whether to plead guilty or go to trial. (*Id.*, 395, 396). The district court later recounted that Liggins "was acting in a manner which was frankly obstructionist and making me mad." (R.132: Tr., 1063). Believing that Liggins was "playing games with the Court," the district court said of Liggins's actions:

> This guy has got my attention, Mr. Arnone. What do you want me to do? This guy looks like a criminal to me. This is what criminals do. This isn't what innocent people, who want a fair trial do.

(R.80: Tr., 397). Mr. Arnone responded that he "can't argue with" the court's "logic." (*Id.*).

After the district court adjourned the proceeding, Liggins wanted the last word. He announced: "I'm going to get you off my case. That's

13

what I'm going to do." (*Id.*, 398). It is not clear if Liggins directed his outburst at the court or Mr. Arnone. The district court ultimately granted Mr. Arnone's motion to withdraw. (R.56: Order, 250).

Attorney John W. Brusstar was up next. (R.55: Appearance, 247). He lasted about 13 months. But Liggins fired him too. (R.131: Tr., 851, 864). Martin Crandall replaced Mr. Brusstar in March 2021. (R.71: Appearance, 354). Trial was then reset again for mid-October 2021.

The night before trial, Liggins filed a motion for recusal of trial judge. (R.94: Motion, 470; R.132: Tr., 881). The motion alleged bias, based on the judge's remarks at the hearing 21 months earlier, on Mr. Arnone's motion to withdraw. (R.94: Motion, 470). The next morning, before beginning jury selection, the district judge said that he appreciated the motion because it would give him "an opportunity to clear up a few things that ha[d] been bothering [him] for a few months." (R.132: Tr., 881). He informed the parties that he was denying the motion, but would provide his reasoning later, because the jurors were already assembled and waiting. (R.96: Order, 494; R.132: Tr: 881).

In explaining his ruling, the district judge expressly apologized to Liggins twice, cited the Supreme Court's seminal decision in *Liteky v.*

14

*United States*, 510 U.S. 540 (1994), indicated that his "conduct at the final pretrial conference, in ruling on the motions in limine and in today's hearing do not evidence any bias," and assured Liggins that he would "act in an impartial and fair manner going forward." (R.132: Tr., 1062–63).

## C.  The jury convicts Liggins.

Testimony began the following day. The government called various law enforcement witnesses from the three airports (Detroit, Phoenix and Louisville), the case agent from DEA (Chad Hermans) and two of Liggins's co-conspirators (Dehaven Murphy and Luz Jiminez).

Murphy was indicted long before Liggins—in 2016. She pleaded guilty to possession with intent to distribute heroin and signed a cooperation agreement. (R.138-3: Gov. Ex. 15, 1729–50; R.138-4: Gov. Ex. 16, 1751–55). Jiminez was the woman who abandoned Liggins's suitcase at the Phoenix airport. (R.134: Tr., 1280). Following her indictment in 2018, Jiminez pleaded guilty to a money laundering conspiracy, and also signed a cooperation agreement. (R.138-5: Gov. Ex. 32, 1756–74; R.138-6: Gov. Ex. 33, 1775–78). Liggins did not move to

15

suppress their testimony or any other evidence associated with them, or otherwise object when they took the stand during trial.

Nor did Liggins object when the government moved for the admission of evidence from Murphy's Instagram account, where she and Liggins communicated with each other using the private message feature. (R.133: Tr., 109).

During cross-examination of Agent Hermans, Liggins's attorney began a line of questioning concerning the execution of a search warrant at Jiminez's home in Arizona. He appeared to be trying to show bias. Because police recovered marijuana and guns at the house, defense counsel suggested that Jiminez was indebted to the government for avoiding a § 924(c) charge. (R.135: Tr., 1536–38). But the prosecutor knew that defense counsel was factually mistaken about the search. When the police arrived at the house, *Liggins* was there. Not Jiminez. (*Id.*, 1541).

The prosecutor requested a sidebar. (*Id.*, 1537). The district court declined to hold one, but it sustained the government's relevance objection when defense counsel continued to press. (*Id.*, 1538). On rebuttal, the prosecutor again requested a sidebar. (*Id.*, 1540). This

16

time, the district court acquiesced. Government counsel explained that defense counsel "opened the door" when he "discussed the 924(c) and the firearms at Ms. Jiminez's home," because Liggins "was physically present during the execution of the search warrant." (*Id.*, 1541). The district court reiterated that the guns at the house were "irrelevant" and "it would open things up that I don't want to open up." (*Id.*). The district court did not allow the prosecutor to elicit testimony that would have implicated Liggins, and she moved on. (*Id.*). Later, the district court prohibited both sides from talking about the guns in closing argument. (*Id.*, 1560–61). Liggins did not object. (*Id.*, 1561).

After "a very short deliberation" (R.123: Def. Sent. Mem., 787), the jury convicted Liggins. (R.101: Verdict Form, 620–21).

## D. The district court denies Liggins's motion for new trial and sentences him at the bottom of the guidelines.

Liggins moved for a new trial under Rule 33. (R.110: Motion, 649–53). For the first time, he complained that the district court should not have permitted Jiminez or Murphy to testify. (*Id.*).

Jiminez had been the target of a wiretap investigation in Arizona that began in September 2015. (*Id.*, 649, 652). The Jiminez wiretap was

part of an investigation conducted by the Maricopa County Sheriff's Office. (*Id.*, 649, 652). In its trial brief, the prosecution conceded that investigators knew to conduct surveillance of Jiminez at the Phoenix airport because of interceptions on the Jiminez wiretap. (R.88: Trial Br., 444). But because the application for interception was authorized by the wrong state official, the government self-suppressed, did not seek to introduce the interceptions from this state wiretap as evidence, and so informed Liggins prior to trial. (*Id.*, 443–45). The government's trial brief also fronted its attenuation theory concerning the admissibility of Jiminez's testimony and Liggins's cash-filled suitcase from the Phoenix airport. (*Id.*, 444). Liggins concedes that "the information related to the [electronic] surveillance of Jiminez was produced to counsel for Liggins prior to trial" in discovery. (Def. Br. at 40).

Notwithstanding his absolute failure to object before—or even during—trial, Liggins argued that he was entitled to a new trial because the district court should not have allowed Jiminez to testify. (R.110: Motion, 651). He further claimed, "on information and belief," that the government learned of Murphy through Jiminez's wiretap, so the district court should have precluded her testimony too. (*Id.*, 650–

18

51). Liggins did not request a hearing on his motion, much less an evidentiary one. (*Id.*, 649–53).

In response, the government explained that on December 2, 2015, a source tipped an ATF task force officer that Murphy would be flying with drugs to Phoenix the next day, and that this information was not derived from the Arizona wiretap. (R.115: Response, 663). A contemporaneous ATF report that the government produced established as much. (R.116-5: Ex., 704). Liggins did not contest the government's explanation and did not file a reply brief.

The district court denied the motion for new trial. It held that "the evidence found on Murphy did not stem from" an unauthorized wiretap, but rather, that "Dehaven Murphy was caught because of a tip[.]" (R.117: Order, 708, 709). Citing the Supreme Court's decision in *United States v. Ceccolini,* 435 U.S. 268, 278 (1978), it also found that Jiminez's testimony was sufficiently attenuated from the wiretap, and that she "testified on her own volition" because she could not be charged with any crimes derived from the wiretap. (*Id.*, 709).

At sentencing, the district court rejected the government's recommendation of 136 months, and sentenced Liggins lower: to 127

19

months. (R.137: Tr., 1686, 1696). This was at the bottom of the guidelines. (*Id*., 1696).

Liggins retained yet another new attorney, and appealed. (R.125: Notice of Appeal, 797).

## Summary of the Argument

Frustrated that Liggins was playing games by hiring and firing attorneys and causing delays, the district court admittedly lost its cool during a pretrial hearing. When Liggins moved for recusal almost two years later—the night before trial began—the district court acknowledged its mistake, twice apologized, and promised Liggins that it would act in an impartial and fair manner going forward. Then, it did just that. The isolated, hostile remarks complained of here do not demonstrate "deep-seated and unequivocal antagonism that would render fair judgment impossible," and do not sustain Liggins's allegations of judicial bias. *Liteky*, 510 U.S. at 556.

Liggins's untimely arguments concerning the Jiminez wiretap fail too. For starters, Liggins did not move to suppress prior to trial, and did not show good cause for his lapse. Even so, his argument suffers from causation and attenuation problems. Murphy was caught because of a tip—not because of the wiretap—so Liggins's challenge to that evidence fails for lack of causation. And both Murphy and Jiminez testified six years after the wiretap, of their own free-will. Under *Ceccolini*, 435 U.S.

at 277, their respective decisions to cooperate broke any causal link between the wiretap and their testimony.

Nor can Liggins establish plain error on his remaining—and unpreserved—arguments. Murphy's responses to Liggins on Instagram were admissible because they provided context for Liggins's own party admissions. And Liggins's proposition that Jiminez dodged a § 924(c) charge was misleading. Liggins—not Jiminez—was present at the house when the police seized the guns, and the district court prevented the government from mentioning that point to protect Liggins from unfair prejudice. Accordingly, the district court did not violate Liggins's trial rights by prohibiting both sides from discussing these firearms during closing argument.

# Argument

## I.    The district court did not abuse its discretion in denying Liggins's last-minute motion for recusal based on isolated comments from almost two years earlier.

Liggins based his eleventh-hour recusal motion on the "commentary of the Court" nearly two years prior, during the January 2020 hearing on Mr. Arnone's motion to withdraw. (R.94: Motion, 470). But opinions formed by the judge from events occurring in the course of the proceedings "do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky*, 510 U.S. at 555. This is true even when the judicial remarks are "hostile." *Id*. Moreover, "expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display" do not establish bias or partiality. *Id*. at 555–56. And so, even "a stern and short-tempered judge's ordinary efforts at courtroom administration" will "remain immune." *Id*. at 556.

The burden is on the moving party to justify disqualification of the trial judge. *Burley v. Gagacki*, 834 F.3d 606, 616 (6th Cir. 2016).

Recusal is warranted "where a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned." *United States v. Adams*, 722 F.3d 788, 837 (6th Cir. 2013); *United States v. Nelson,* 922 F.2d 311, 319–20 (6th Cir. 1990). The parties agree (Def. Br. at 27) that this Court reviews a district court's refusal to grant a motion for recusal for abuse of discretion. *United States v. Dandy*, 998 F.2d 1344, 1349 (6th Cir. 1993).

Given Liggins's conduct during the preceding months, the district court had good reason to be frustrated with Liggins at the hearing in January 2020. Liggins had already fired his retained attorney and was now trying to fire an appointed one. Liggins had twice indicated to the district court that he intended to plead guilty—first, in the Rule 20 transfer from Kentucky, and then again, just before trial—before abruptly changing course after the court had accommodated him. On the latter occasion, the court went through the logistical trouble of canceling a scheduled trial at the last minute, only for Liggins to change his mind about pleading guilty and request a trial again. And throughout those proceedings, the district court had indulged all of Liggins's requests—agreeing to Liggins's "unusual" request to have a

24

presentencing report prepared before entering a plea (R.128: Tr., 818), permitting him to fire his retained counsel (R.129: Tr., 824–29), and agreeing to an adjournment of trial so Liggins's new appointed counsel could review the discovery with him (R.127: Tr., 801–06).

So it was understandable that the district judge was concerned about Liggins "playing games"—by hiring and firing attorneys and causing delays. The issue was not, as defense counsel suggests on appeal, simply that Liggins was unwilling to plead guilty. (Def. Br. at 5). It was that Liggins waffled back and forth about pleading or going to trial so many times that his conduct was becoming, in the district court's view, "obstructionist." (R.132: Tr., 1063). The district court reasonably thought it was being "messed with." (R.80: Tr., 396). And although the district judge should not have lost his temper with Liggins in the way that he did, the district judge should "not be judged too harshly for expressing understandable concerns about delays, even if we would have expressed those concerns in a more muted manner." *United States v. Musaibli*, No. 22-1013, 2022 WL 4138327, at *3 (6th Cir. Sept. 13, 2022) ("the judge appears to understand his remarks as venting frustrations, not plotting revenge").

25

Nor did the district court indicate improper bias in his remark that "This guy looks like a criminal to me. This is what criminals do." The context of this comment does not support Liggins's allegation of racial bias, but rather shows that the district court was focused on what Liggins was *doing*—because Liggins was not behaving in the way that a person who wanted a fair trial normally behaves. In his ruling on the recusal motion, the district judge explained that when he made his remark, he was not concluding that Liggins "was guilty of an offense," but rather, that Liggins "was acting in a manner which was frankly obstructionist." (R.132: Tr., 1063). The district court's frustrations were borne from his perceptions of Liggins's *conduct*—nothing else.

In criticizing the district judge for not allowing him to speak at the hearing (Def. Br. at 4), Liggins also breezes past the reality that he was still represented by counsel at the time. To prevent defendants from making harmful admissions, judges routinely decline to hear directly from represented defendants and require them to communicate though counsel. Liggins has identified no precedent indicating that a represented defendant has any right to speak directly to the court at a pretrial hearing, and there is no constitutional right to hybrid

representation. *See United States v. Cromer*, 389 F.3d 662, 682, n.12
(6th Cir. 2004). Given that Liggins was still represented by Mr. Arnone,
the district judge had ample discretion to decline to hear direct
statements from Liggins.

Liggins is correct that when the district court denied Liggins's
last-minute recusal motion in October 2021, the judge's recollection of
case events in late 2019 and early 2020 was imprecise. The district
court appears to have conflated the events of September 2019 (when
Liggins was expected to plead) with the hearing in January 2020 (when
he admonished Liggins during the hearing on the Arnone motion to
withdraw). The district court also confused Liggins's third attorney
(Brusstar) with his second (Arnone). But a muddled memory doesn't
establish bias. Moreover, Liggins waited almost two years to make his
recusal motion. It would be a strange reward for strategic behavior if
Liggins's long delay benefitted his recusal argument, just because the
district court's recollection of what happened had faded in the
meantime.

Rather, the more germane focus for our purposes is on the portion
of the transcript where the district judge apologizes. Twice. He begins:

27

"And I want to say right now directly to Mr. Liggins I'm sorry, I apologize for getting upset." (R.132: Tr., 1062). And again, a few minutes later: "Was I imperfect? Was I mad? Was I stupid? Yes, I made a mistake. I regret it, I apologize." (*Id.*, 1064).

*Liteky* leaves room for angry judges, and none of the authorities that Liggins cites involve an apology from the jurist accused of bias. Rather, in *United States v. Antar*, 53 F.3d 568, 576 (3d Cir. 1995), "the district judge, in stark, plain and unambiguous language, told the parties that his goal in the criminal case, from the beginning, was something [] improper." Here, the district judge admittedly lost his cool. But he did not have an "improper" and antagonistic agenda against Liggins from day one, like the *Antar* judge admittedly did. *Id*.

Nor can Liggins show bias from the district judge's attempt to make amends by saying that he would give Liggins "the same rights and opportunities here to demonstrate his innocence or lack of guilt as any other litigant." (R.132: Tr., 1062–63). The district judge was not trying to punish Liggins or change anything about the trial. He was promising, though inarticulately, to honor Liggins's right to present a defense under the Sixth Amendment. And although the district judge's

28

articulation of the standard of proof was undoubtedly wrong, the district judge made this remark outside the presence of the jury. "Much of the concern about an otherwise inappropriate judicial act or remark is neutralized by the absence of the jury." *United States v. Morrow*, 977 F.2d 222, 228 (6th Cir. 1992) (en banc); *United States v. Blood*, 435 F.3d 612, 629 (6th Cir. 2006) ("Blood has failed to meet the 'high hurdle' required to prove bias from remarks made in the absence of the jury."); *see also United States v. Smith,* 928 F.2d 740, 741–43 (6th Cir. 1991).

Most importantly, when addressing and instructing the jury on this point, the district court got it right. During voir dire, the district court correctly emphasized that Liggins did not have to put on a case when it discussed with the prospective jurors Liggins's "Fifth Amendment right not to testify." (R.132: Tr., 964). As the court asked the venire: "the question I have for you, and this is really important, is whether or not any of you believe that a defendant who does not testify is entitled to a negative inference or may be guilty? That's not the law." (R.132: Tr., 964). The court continued: "Doesn't look like anybody is motivated to think negatively of a defendant who chooses not to testify and that's a very good thing indeed." (*Id.*, 964–95). The judge also

29

discussed with a juror with a police relative: "you have to be fair to Mr. Liggins and his side of the courtroom as well and take the testimony that you get from [law enforcement witnesses] objectively. Are you able to do that?" (*Id*., 959). The following day, the district court correctly instructed the jury that "Mr. Liggins is presumed innocent until proven guilty," and that he "starts out with a clean slate and is presumed innocent of the crimes he's charged with." (R.133: Tr., 1090). The district court also told the jurors that Liggins "has no burden to prove his" "innocence or to present any evidence or to testify," and that the defense was not even required to give an opening statement. (*Id*., 1090–91, 1095).

In the final instructions, the district court again correctly told the jury that "the defendant starts a trial with a clean slate, with no evidence at all against him, and the law presumes that he's innocent." (R.136: Tr., 1632). The district court explained that this "presumption of innocence stays with the defendant unless the government presents evidence here in court that overcomes the presumption and convinces you beyond a reasonable doubt that he's guilty." (*Id*.). The district court also confirmed that Liggins "has no obligation to present any evidence

at all or to prove to you in any way that he is -- that he is innocent." (*Id.*). Rather, it is "up to the government to prove that the defendant is guilty, and the burden stays on the government from the start to the finish." (*Id.*). The district court later reminded them that "it's up to the government to prove a defendant guilty beyond a reasonable doubt. It is not up to a defendant to prove that he is innocent." (*Id.*, 1652).

As important, the trial record shows no evidence of bias—or any lingering frustration with Liggins. On the first day of testimony, the district judge welcomed the defense and noted "good to see Mr. Liggins as always." (R.133: Tr., 1079). The district court rejected a draw-from-a-hat approach to dismissing alternate jurors to address "issues in our district for many years regarding the representation of minority jurors," to "assure ourselves of not dismissing any minority jurors," because "these folks who have been [] unrepresented statistically have the right to serve." (*Id.*, 1210–11).

As the proceedings continued, the district court sustained several defense objections, and overruled several government objections. (R.133: Tr., 1137, 1157, 1180, 1206; R.135: Tr., 1518). Even though some of defense counsel's questions of the case agent on cross were "beyond

direct" and did not seem to be "impeachment material," the judge gave counsel "a little latitude" and "some rein," permitting him to "go right ahead." (R.135: Tr., 1512). A few minutes later, he allowed defense counsel to similarly "go ahead" with a compound question, over the government's objection, and also responded to counsel's next request for "a little latitude" with "[t]ake your time." (*Id.*, 1531–32). Finally, over a government objection that a line of questioning had been asked and answered, he "let the agent respond." (*Id.*, 1535). At no point did the district judge's trial rulings suggest any sort of one-sided treatment.

Nor did the district judge display any antagonism against Liggins at sentencing. Far from it. He sustained Liggins's sentencing objection. (R.137: Sent. Tr., 1676). Then, over the government's objection, he permitted Liggins's father to allocute, stating that he would be "delighted to hear from Mr. Liggins's father Louis," to whom he was "entirely sympathetic." (*Id.*, 1679–80, 1684). He rejected the government's recommendation of 136 months, recognized that Liggins had two "involved, loving, responsible, employed, caring" parents, and highlighted the "opportunity" that Liggins had to "get treatment," "stick by the program," and then "make a go of" it with his dad in the family

electric business following his release. (*Id.*, 1686, 1692, 1695–96). The sentence was 127 months—at the bottom of the guideline range. (*Id.*, 1696). Then, at the end of the proceeding, the district judge "wish[ed] the very best to Mr. Liggins." (*Id.*, 1699).

The district judge lost his temper at a pretrial hearing in January 2020. He admitted his mistake, repeatedly expressed his regret for doing so, and twice apologized to Liggins. But a review of this judge's overall conduct in this case—from the time of indictment in February 2018 through sentencing in March 2022—did not reveal a deep-seated antagonism against Liggins that made fair judgment impossible. The district court did not abuse its discretion in denying Liggins's motion for recusal.

Liggins's related request for reassignment fails for the same reasons. (Def. Br. at 47). Reassignment is an extraordinary power that should be rarely invoked. *See U.S. ex rel. Williams v. Renal Care Grp., Inc.*, 696 F.3d 518, 533 (6th Cir. 2012); *see also Musaibli*, 2022 WL 4138327, at *3 (denying government's motion for reassignment following mandamus). To determine whether reassignment is necessary, this Court considers whether (1) the original judge would

33

reasonably be expected to have substantial difficulty in putting out of his mind previously expressed views or findings; (2) reassignment is advisable to preserve the appearance of justice; and (3) reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness. *Williams,* 696 F.3d at 533.

None of those factors support reassignment here. Because Liggins has not established sufficient grounds for recusal, reassignment would not be needed to preserve the appearance of justice. There is no reason to think that the district judge would have substantial difficulty in putting out of his mind previously expressed views or findings. He readily explained that he appreciated the recusal motion because it gave him "an opportunity to clear up a few things that ha[d] been bothering [him] for a few months." (R.132: Tr., 881). Then, after apologizing to Liggins, he treated Liggins fairly in ruling on the evidence, overseeing the trial, and sentencing Liggins at the bottom of the guidelines. Finally, the district judge would be more acquainted with the record and could expedite any further proceedings if this Court were to remand on some basis. Reassignment is unwarranted.

34

II.    **Liggins is not entitled to a new trial based on his post-trial suppression arguments.**

Liggins's motion for new trial was nothing more than an untimely motion to suppress by another name. A defendant must move to suppress evidence in a pretrial motion. Fed. R. Crim. P. 12(b)(3)(C). Failure to "meet the deadline for making a Rule 12(b)(3) motion" renders the motion untimely. Fed. R. Crim. P. 12(c)(3). Thus, a defendant can raise a suppression argument post-trial only if he establishes "good cause" for failing to raise it earlier. *Id.*; *see United States v. Bankston*, 820 F.3d 215, 229 (6th Cir. 2016).

Liggins never demonstrated good cause for his untimely suppression motion. In his motion for new trial, he claimed that he did not receive the necessary discovery from the government in time to file a pretrial motion. (R.110: Motion, 650). But on appeal, he concedes that this wasn't true. (Def Br. at 40). In other words, Liggins possessed all of the information necessary to make a pretrial motion, but did not. And although the district court elected to rule on the merits of Liggins's suppression claim, despite its untimeliness, that decision does not preserve the issue for appellate review. *See United States v. Obiukwu*,

35

17 F.3d 816, 819 (6th Cir. 1994); *United States v. Oldfield,* 859 F.2d 392, 396 (6th Cir. 1988); *United States v. Sachs,* 801 F.2d 839, 847 (6th Cir. 1986). Rather, Liggins's failure to establish good cause for failing to move to suppress prior to trial precludes appellate review of his arguments. *See United States v. Farmer*, 38 F.4th 591, 605 (7th Cir. 2022); *United States v. Sands*, 815 F.3d 1057, 1061 (7th Cir. 2015).

But even if this Court were to follow the district court's approach and address Liggins's suppression arguments on the merits, the district court correctly rejected those arguments and exercised its discretion in denying Liggins's motion for new trial. Upon the defendant's motion, Rule 33 permits the district court to vacate any judgment and grant a new trial to that defendant if the interest of justice so requires. Fed. R. Crim. P. 33(a). The rule does not define "interest of justice," but this Court has held that the interest of justice standard "allows the grant of a new trial where substantial legal error has occurred." *United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010). It is the defendant's burden to establish a right to a new trial. *United States v. Pierce,* 62 F.3d 818, 823 (6th Cir. 1995) (citing *United States v. Davis,* 15 F.3d 526, 531 (6th Cir. 1994)).

36

"The decision whether to grant a new trial is left to the sound discretion of the district court, and this Court will not reverse absent a clear abuse of discretion." *United States v. Dunnican*, 961 F.3d 859, 878 (6th Cir. 2020) (citing *Pierce*, 62 F.3d at 823); *United States v. Munoz*, 605 F.3d 359, 366 (6th Cir. 2010). This is true even where, as here, the defendant's motion for new trial is based on a Fourth Amendment challenge. *See United States v. Soto*, 794 F.3d 635, 647 (6th Cir. 2015). What's more, when this Court evaluates the district court's denial of a motion to suppress evidence, it "consider[s] the evidence in the light most favorable to the government." *United States v. Woods*, 711 F.3d 737, 740 (6th Cir. 2013).

Liggins cannot demonstrate any abuse of discretion under that standard. First, given Liggins's failure to challenge the government's explanation that ATF learned of Dehaven Murphy from an independent source of information, the district court did not rely on clearly erroneous findings of fact when it concluded that Murphy "was caught because of a tip[,]" not because of the wiretap. (R.117: Order, 708). Second, because Jiminez and Murphy both testified of their own free will, their 2021

37

trial testimony was sufficiently attenuated from the 2015 wiretap to dissipate any potential taint anyway. (*Id.*, 709).

### A.    Dehaven Murphy was caught because of a tip—not because of the Jiminez wiretap.

Liggins's argument concerning Dehaven Murphy failed for a simple reason: Liggins did not demonstrate any causal connection whatsoever between Murphy and the Jiminez wiretap. A defendant may not invoke the exclusionary rule as a blanket attack against any and all evidence gathered against him anywhere. *See Hudson v. Michigan*, 547 U.S. 586, 592 (2006). Rather, he must demonstrate that the alleged illegality "is at least the 'but for' cause of the discovery of the evidence" that he is seeking to suppress. *United States v. Clariot*, 655 F.3d 550, 553 (6th Cir. 2011). "But for" causation is a "necessary," but "not a sufficient, condition for suppression." *Hudson*, 547 U.S. at 592–93; *see also United States v. Figueredo-Diaz*, 718 F.3d 568, 575–76 (6th Cir. 2013). Indeed, the "exclusionary rule forbids the government from using evidence *caused* by an illegal seizure, not evidence found around the time of a seizure." *Clariot*, 655 F.3d at 555.

Here, as in *Figueredo-Diaz*, the "well-established principles regarding causation control," and their "application is the reason that suppression is not warranted." 718 F.3d at 575. In his arguments below, Liggins initially alleged that he did not get discovery concerning the Jiminez wiretap, and then speculated, on "information and belief," that there was a causal connection between the wiretap and Murphy. (R.110: Motion, 649–50). But in response, the government established something that Liggins now concedes: he *did* get the discovery about the Jiminez wiretap. (R.115: Response, 662). As Liggins admits in his brief at page 40, "it is clear that" "the information related to the [electronic] surveillance of Jiminez was produced to counsel for Liggins prior to trial." (Def. Br. at 40).

Even with that evidence in his possession, Liggins never attempted to demonstrate any causal connection between the wiretap and Murphy. Nor could he. As the government explained, ATF learned of Murphy from a tip, not from the wiretap. (R.115: Response, 663). This explanation was supported by a contemporaneous report of investigation. (R.116-5: Ex., 704). ATF task force officer Delshawn King authored the report in December 2015, stating that on December 2,

2015, he "received information from a credible source" that Dehaven Murphy was scheduled to fly out of Detroit Metropolitan Airport to Phoenix on an American Airlines flight, and was "believed to be in possession of 300 grams of heroin." (*Id.*). This, too, was known by the defense prior to trial, and defense counsel expressly referenced King's "source of information" during questioning. (R.135: Tr., 1510, 1512, 1514).

In addition, the trial testimony of Dehaven Murphy, Luz Jiminez, and Agent Chad Hermans further reinforced the district court's conclusion that Murphy was caught because of a tip. Murphy testified that although she knows Liggins from high school, she has never met Jiminez. (R.133: Tr., 1204). Jiminez's testimony similarly confirmed that the two women don't know each other. When asked if she was aware of "something happening at another airport" in December 2015, Jiminez knew only that a "girl" who "grew up with" Liggins "got caught." (R.134: Tr., 1283). Then Agent Hermans confirmed, under questioning from defense counsel, that on December 2, 2015, King received, "from a source of information, the fact that Dehaven Murphy was going to be flying on that flight to Phoenix the next day." (R.135:

40

Tr., 1510). Importantly, Agent Hermans also confirmed that there was not "any electronic surveillance leading up to the December 2 source of information or the December 3 arrest" of Dehaven Murphy. (*Id.*, 1514).

Contrary to Liggins's remonstrations now, the issue before the district court was indeed "straightforward." (R.117: Order, 707). For starters, this Court has held in similar contexts that a "bare assertion 'on information and belief' is not enough" to establish an evidentiary foundation for an accusation of government wrongdoing. *See United States v. Stark*, 758 F. App'x 518, 520 (6th Cir. 2019); *Keilholtz v. United States*, No. 22-5103, 2022 WL 3221935, at *3 (6th Cir. July 21, 2022). Liggins never contested the government's explanation, and King's report remained "unchallenged." *Figueredo-Diaz*, 718 F.3d at 575. In his motion, Liggins implied that if he had the discovery, he would be able to reveal the connection between the wiretap and Murphy. But even after being reminded that he did have the discovery, Liggins did not provide the district court with any information supporting his supposition concerning causation. The district court did not abuse its discretion in crediting the government's evidence when Liggins offered nothing to rebut it.

41

Even now, Liggins cannot identify any clearly erroneous finding of fact by the district court. Rather, he argues that "where a criminal defendant shows some contested facts, an evidentiary hearing should be ordered." (Def. Br. at 38). But that is precisely his problem: Liggins didn't show any contested facts. He jumped to an unsupported conclusion about causation—based on "information and belief" alone—and the government responded with an explanation that Liggins left unchallenged.

Moreover, the district court's decision to resolve the motion on the briefs was perfectly understandable, given that Liggins never asked for a hearing or put forward any facts challenging the government's explanation. "The question of whether to decide a motion on the supporting evidence filed with the motion or to hold an evidentiary hearing is within the discretion of the trial court." *United States v. Smith*, 749 F.3d 465, 493 (6th Cir. 2014); *see also United States v. O'Dell,* 805 F.2d 637, 643 (6th Cir. 1986). But because Liggins failed to request an evidentiary hearing below, he forfeited his claim of error on that point, and this Court's review is limited to plain error. *See Puckett v. United States*, 556 U.S. 129, 135–36 (2009). Liggins cannot

42

demonstrate any error at all here, much less plain error, given the absence of a factual dispute before the district court. *See Smith*, 749 F.3d at 493; *O'Dell,* 805 F.2d at 643; *United States v. Anderson*, 76 F.3d 685, 692 (6th Cir. 1996).

Indeed, Liggins's own authorities support the district court's decision. In *Matter of Searches & Seizures Conducted on Oct. 2, & 3, 1980*, 665 F.2d 775, 776 (7th Cir. 1981), the Seventh Circuit held that no evidentiary hearing on the motion was required because the movant failed to meet his burden showing that there were disputed material facts. And in *United States v. Smith*, 546 F.2d 1275, 1281 (5th Cir. 1977), the Fifth Circuit affirmed the district court's decision not to conduct a hearing concerning impermissible suggestiveness in a photographic spread.

For the first time on appeal, Liggins argues that he should have been permitted to challenge "the credibility of witnesses." (Def. Br. at 38). But he cannot show plain error on this point, either. There were no affidavits in play, and ATF did not rely on its source of information to establish probable cause. The source merely tipped that Dehaven Murphy was scheduled to fly from Detroit to Phoenix on American

43

Airlines and was believed to be in possession of 300 grams of heroin. (R.116-5: Ex., 704). A trained drug detection dog alerted on her checked luggage at the airport. (R.133: Tr., 1123). Then, she consented to the search of her bag. (*Id.*, 1124).

Liggins's failure to demonstrate causation thus ends his suppression argument as to Murphy. In *Clariot*, 655 F.3d at 555, this Court reversed suppression of evidence given the defendant's "failure to establish any causative link between the alleged misconduct and the evidentiary discovery." Similarly, in *Figueredo-Diaz*, 718 F.3d at 575–76, this Court reversed suppression of evidence where the defendants' "case for suppression" "fail[ed] on the requirement of causation" because a questionable detention was "entirely superfluous so far as the discovery of evidence is concerned," and the evidence "had nothing to do with defendants being detained." And the Supreme Court has explained that "[s]uppression of evidence ... has always been our last resort, not our first impulse." *Utah v. Strieff*, 579 U.S. 232, 237–38 (2016). Liggins was required to do more to meet his burden that he was entitled to a new trial than just speculate about causation. "A new trial is an extraordinary remedy for extraordinary circumstances." *United States*

44

*v. VanDemark*, 39 F.4th 318, 322 (6th Cir. 2022) (quotation omitted).

The circumstances here are nothing of the sort.

### B. The 2021 trial testimony was sufficiently attenuated from the 2015 wiretap.

Unlike Murphy, Jiminez was admittedly—and quite obviously—
connected to the wiretap. But even so, "exclusion may not be premised
on the mere fact that a constitutional violation was a 'but-for' cause of
obtaining evidence." *Hudson*, 547 U.S. at 592. And even assuming that
the authorization glitch made the Jiminez wiretap "illegal," the
Supreme Court has repeatedly held that evidence does not become fruit
of the poisonous tree "simply because 'it would not have come to light
but for the illegal actions of the police.'" *See Segura v. United States*,
468 U.S. 796, 815 (1984); *see also Hudson*, 547 U.S. at 592; *United
States v. Elmore*, 18 F.4th 193, 202 (6th Cir. 2021).

Here, in denying Liggins's motion for new trial, the district court
correctly applied Supreme Court precedent and held that Jiminez's
voluntary testimony in 2021 was sufficiently attenuated from her
wiretap in 2015. In *Ceccolini,* 435 U.S. at 279, the Supreme Court held
that witness testimony given as "an act of ... free will," after

45

"[s]ubstantial periods of time elapsed between the time of the illegal search and the initial contact with the witness ... and the testimony at trial" was sufficiently attenuated from the problematic search to avoid application of the exclusionary rule. The Court further reasoned that "the illegality which led to the discovery of the witness very often will not play any meaningful part in the witness' willingness to testify." *Id.* at 277. Further, in *United States v. Wac*, 498 F.2d 1227, 1232 (6th Cir. 1974), this Court recognized that the attenuation doctrine can apply in cases involving wiretaps with authorization problems. The district court relied on both cases in denying Liggins's motion for new trial. (R.117: Order, 708–09).

Liggins ignores *Ceccolini* and *Wac*. He instead cites *United States v. Giordano*, 416 U.S. 505, 524 (1974), and *United States v. Rice*, 478 F.3d 704, 710 (6th Cir. 2007), for the general proposition that the exclusionary rule can apply in wiretap cases. (Def. Br. at 32). But even Liggins acknowledges that the attenuation doctrine is an established exception to the exclusionary rule. (*Id*. at 38). His reliance on *United States v. Williams*, 615 F.3d 657, 660 (6th Cir. 2010) is misplaced too. *Williams* dealt with whether sufficient attenuation existed between the

unlawful stop of the defendant and his own inculpatory statement made "only seconds" after. *Williams*, 615 F.3d at 669. None of Liggins's authorities addresses the issue he has raised here—whether the trial testimony of a cooperating co-conspirator was sufficiently attenuated from a problematic search that took place several years prior.

The district court's ruling was further supported by various decisions applying *Ceccolini* and holding that the live witness testimony from co-defendants was sufficiently attenuated from the problematic searches in those cases. In *United States v. Akridge*, 346 F.3d 618, 621 (6th Cir. 2003), this Court held that the testimony of a co-defendant who had pleaded guilty was admissible as a product of free will. Similarly, in *United States v. Gray*, 491 F.3d 138, 156–57 (4th Cir. 2007), the Fourth Circuit held that the cooperating co-defendant's testimony was sufficiently attenuated, particularly given that his "plea agreement" was "distant in time from the constitutional violation." *See also United States v. Sweets*, 526 F.3d 122, 129 (4th Cir. 2007) (cooperating witness's "independent acts of will to plead guilty and testify against" defendant, coupled with the "lapse of time," "utterly

47

undermine any connection between the purported constitutional violation and the testimony of the witness").

Even "where the identity and potential usefulness of a witness is revealed as the result of an unlawful search," the Second Circuit held that "the willingness of that individual to testify despite the illegal intrusion represents a significant attenuation of the link between the police misconduct and its evidentiary fruits." *United States v. Leonardi*, 623 F.2d 746, 752 (2d Cir. 1980). Likewise, in *United States v. White*, 746 F.2d 426, 428 (8th Cir. 1984), the Eighth Circuit held that even though it was "arguable" that "the illegal wiretap led to his discovery as a witness against" the defendant, the witness's "cooperation with DEA and testimony at trial was voluntary and with full knowledge of his fifth amendment rights," and sufficiently attenuated from the problematic wiretap in that case.

The interceptions from the wiretap here took place in the fall of 2015. (R.110: Motion, 649). Jiminez signed her written plea and cooperation agreements in May 2019. (R.138-5: Gov. Ex. 32, 1766; R.138-6: Gov. Ex. 33, 1778). She testified at trial six years after the interceptions—in the fall of 2021. (R.134: Tr., 51). Liggins does not

dispute that Jiminez's cooperation and trial testimony resulted from an exercise of her free will and were the "product of detached reflection and a desire to be cooperative." *Ceccolini*, 435 U.S. at 277; *Akridge*, 346 F.3d at 630. Under *Ceccolini*, then, Jiminez's decision to cooperate broke any causal link between her testimony and the wiretap, foreclosing Liggins's only suppression argument related to her testimony.

The attenuation doctrine also provides an alternative basis for affirming the district court's ruling concerning the testimony of Dehaven Murphy. Even if Liggins had been able to show that there was some connection between Murphy and the Jiminez wiretap, Murphy signed her plea and cooperation agreements in 2017, well before Liggins was even indicted. (R.138-3: Gov. Ex. 15, 1737; R.138-4: Gov. Ex. 16, 1755). Then Murphy testified of her own free will. (R.133: Tr., 68). Her voluntary trial testimony, like Jiminez's, was sufficiently attenuated from the wiretap to dissipate any potential taint. *Ceccolini*, 435 U.S. at 277; *Akridge*, 346 F.3d at 630.

49

## III.  The district court did not plainly err in admitting Murphy's responses to Liggins on Instagram.

After Murphy was indicted, Liggins contacted her through Instagram's private message feature. They exchanged several messages, with Liggins repeatedly asking her to send him the discovery from her federal criminal case, so he could see if he was implicated in the government's evidence. (R.133: Tr., 1178–84; R.138-2: Gov. Ex. 14, 1704–28). Screen shots of these Instagram messages were admitted into evidence at trial as Exhibit 14, with no objection from Liggins. (R.138-2: Gov. Ex. 14, 1704–28; R.133: Tr., 1182).

Liggins does not dispute that his statements to Murphy were properly admitted under Federal Rule of Evidence 801(d)(2). But for the first time on appeal, Liggins claims that the district court erred in admitting Murphy's various responses back to him, because he believes they are hearsay. (Def. Br. at 45).

Liggins concedes that he did not object below, and that the standard of review is plain error. (*Id.*). To demonstrate plain error, Liggins must show (1) "an error"; (2) that "the error is 'clear or obvious,' rather than subject to reasonable dispute"; (3) that the error "affected

50

[his] substantial rights"—meaning that "it affected the outcome of the district court proceedings"; and (4) that "the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Marcus*, 560 U.S. 258, 262 (2010) (cleaned up). "Meeting all four prongs is difficult, 'as it should be.'" *Puckett v. United States*, 556 U.S. 129, 135 (2009) (*citing United States v. Dominguez Benitez,* 542 U.S. 74, 83, n. 9 (2004)).

The Federal Rules of Evidence define a "statement" as "an oral or written assertion" (or nonverbal conduct intended as an assertion). Fed. R. Evid. 801(a). Some of Murphy's responses to Liggins are questions, and so they do not qualify as hearsay. Questions are not "assertive speech at all," and do not "assert a proposition that could be true or false." *United States v. Rodriguez-Lopez*, 565 F.3d 312, 314 (6th Cir. 2009) (reversing suppression of calls made to the defendant's phone to order drugs because they were hearsay); *United States v. Wright*, 343 F.3d 849, 865 (6th Cir. 2003) (A "question is typically not hearsay because it does not assert the truth or falsity of a fact.").

Murphy's other responses to Liggins were admitted not to show the truth of the matters asserted, but to provide context for Liggins's

51

party admissions. This Court has frequently affirmed the admission of such evidence. *See United States v. Harrison,* ___ F.4th ___, No. 21-6146, 2022 WL 17348750, at *2 (6th Cir. Dec. 1, 2022) (Statements "weren't used for their truth. They were used only to give context to [the defendant's] admissible words and actions."); *United States v. Dunnican*, 961 F.3d 859, 872–73 (6th Cir. 2020) (affirming district court's admission of "portions of the electronic conversations connected to unidentified parties who conversed with the defendant," in order to provide context to defendant's own statements); *United States v. Henderson,* 626 F.3d 326, 337 (6th Cir. 2010) (characterizing statements made by defendant during recorded telephone conversations as non-hearsay admissions under Rule 801(d)(2)(A), and concluding that the admission of statements made by others in the phone call were not to show the truth of the matter asserted, but instead, to provide context for defendant's admissions); *United States v. Jacob,* 377 F.3d 573, 581 (6th Cir. 2004) (affirming admission of recording that contained a conversation between defendant and a co-conspirator, offered to provide context to the defendant's party admissions). Liggins's citation to one

unpublished district court ruling on a motion in limine (Def. Br. at 46) is unpersuasive in the face of these published decisions from this Court.

Moreover, Liggins does not seriously contend that Murphy's statements about whether Liggins left her "hanging," or whether Murphy was "the only person in trouble" were offered for their truth. (*Id*.). Rather, he argues that they "go to the truth of whether Liggins was involved in a conspiracy or in aiding and abetting Murphy." (*Id*.). But as this Court explained in *Rodriguez-Lopez*, "the fact that out-of-court statements are being used to support a material inference does not by itself make them hearsay; it makes them relevant." 565 F.3d at 315. Along the same lines, in *Harrison*, ___ F.4th ___, 2022 WL 17348750, at *2, this Court recently recognized that "almost any out-of-court statement the government offers in court is admitted to prove the government's case in some way. Otherwise, there would be no reason to introduce the statement at all." What's more, the *Harrison* court clarified once and for all that "'the matter asserted' means the matter asserted by the *statement*, not the matter asserted by the *government*." *Id*.

53

Likewise here, Murphy's statements were not offered to prove the truth of what she said, but because they provided context for Liggins's admissions during their conversation. For instance, in response to Murphy's statements about her own legal troubles, Liggins asked for her discovery "to see if his name was on it." (R.133: Tr., 1182). This exchange was not used to prove that Murphy had legal troubles, but rather as probative circumstantial evidence of Liggins's involvement in a conspiracy with Murphy. *Id.*; *see also United States v. Evans*, 883 F.2d 496, 501 (6th Cir. 1989) (statement was not offered to prove the truth of the matter asserted because statements were "only offered to construct the sequence of events"); *Dandy*, 998 F.2d at 1351 (statement was not offered to prove the truth of the matter asserted where "the relevance of this statement lies in the fact that what was said indicated a breakdown in the relationship" between the defendant and his associate).

Nor can Liggins show any negative affect on his substantial rights. *Jacob*, 377 F.3d at 581 (defendant failed to point to any prejudice resulting from the admission of statements). At best, he claims that Murphy's statements "unfairly corroborated and bolstered Murphy's

54

testimony." (Def. Br. at 46). But the government did not "make use of these messages" in the way that Liggins claims. (*Id.*). The "conversation" between Liggins and Murphy that is captured in Exhibit 14 was the subject of just three pages of trial transcript. (R.133: Tr., 1181–84). The prosecutor tightly focused his questioning on Liggins's repeated requests for Murphy's discovery, Liggins's concerns that Murphy might be working with the police, and what Liggins could do for Murphy. (*Id.*). During closing argument, the government emphasized how Liggins repeatedly "tried to get a copy of Dehaven Murphy's discovery" by "reaching out to her through Instagram," so he could "find out if she was cooperating with law enforcement" and whether "he was going to be implicated in her arrest." (R.136: Tr., 1583). Liggins's actions—not Murphy's statements—were the focus.

Moreover, the government produced substantial evidence of Liggins's involvement in the drug conspiracy with Murphy well beyond her Instagram responses. She testified at length about it. (R.133: Tr., 1141–1207). The jury heard recordings of calls between Liggins and Murphy where Liggins discussed it. (Gov. Exs. 9–11 (audio recordings) (on file with the Sixth Circuit clerk's office)). And the jury saw Liggins's

55

non-hearsay admissions to her on Instagram about it. (R.138-2: Gov.

Ex. 14, 1704–28). All told, the idea that the verdict was "substantially

swayed" by any improper use of Murphy's Instagram responses to

Liggins is "implausible." *United States v. Chavez*, 951 F.3d 349, 360 (6th

Cir. 2020).

## IV.  The district court did not violate Liggins's trial rights by forbidding either side from discussing guns during summation.

Jiminez has an adult son named Jesus Leon. (R.118: PSR, 722

(¶38)). About 14 months after Liggins's October 2015 check and miss at

the Phoenix airport, law enforcement officers seeking to arrest Leon on

a federal warrant for drug trafficking and money laundering in a

different case went to Leon's house. (*Id.*). Jiminez and Leon lived there

together. Liggins had been staying there too. (*Id.*, 722 (¶39)). Jiminez

was not home when the police arrived. But Leon and Liggins were. (*Id.*).

After obtaining a search warrant, investigators seized almost 11

kilograms of marijuana, ten firearms, and four loaded magazines from

the home. (*Id.*, 722, ¶40).

Liggins's attorney did not ask Jiminez any questions about this

search and seizure at trial. But during cross-examination of the case

agent, defense counsel insinuated that by cooperating with the government, Jiminez dodged a § 924(c) charge and a 5-year mandatory consecutive penalty stemming from this raid. (R.135: Tr., 1536–38).

Armed with the knowledge that Jiminez was not even home when the police arrived—but Liggins was—the prosecutor objected and requested a sidebar. (*Id.*, 1537). The district court declined to hold one, but it sustained the government's relevance objection when defense counsel continued to press. (*Id.*, 1538). On rebuttal, the prosecutor again requested a sidebar to get clarification on whether she could present certain evidence. (*Id.*, 1540). She explained that defense counsel "opened the door" when he "discussed the 924(c) and the firearms at Ms. Jiminez's home," because Liggins "was physically present during the execution of the search warrant." (*Id.*, 1541). The district court reiterated that the guns at the house were "irrelevant" and "it would open things up that I don't want to open up." (*Id.*). He prohibited the government from soliciting additional testimony establishing that Liggins—and not Jiminez—was there with the guns. (*Id.*). Later, the prosecutor reasoned that Liggins should be prohibited from arguing to the jury that Jiminez could have been charged for the guns, because it

was misleading. (*Id.*, 1560). The district court ordered "both sides to avoid speaking about any guns, firearms, weapons or 924(c)'s during their closing arguments," because that's not "what this case is about and it could inflame or distract the jury." (*Id.*, 1560–61). Liggins did not object. (*Id.*, 1561).

But now, Liggins argues that this ruling violated his right to a fair trial because the district court improperly prohibited his attorney from exploring Jiminez's "motivation to lie" during closing argument. (Def. Br. at 42). But Liggins did not object when the district court limited the scope of the parties' summations, and never made this argument below, so this Court reviews it now only for plain error. *See Puckett*, 556 U.S. at 135–36.

What's more, Liggins's characterization of the record doesn't square with what actually happened. By suggesting that Jiminez may have been facing a § 924(c) charge, Liggins opened the door for the government to clarify that he—and not Jiminez—was home with the guns and drugs, and that *Liggins* may have committed additional crimes beyond those alleged in the indictment. (R.135: Tr., 1560–61). Allowing the government to correct the record would have hurt Liggins.

58

To protect Liggins, the district court was right not to "open things up that I don't want to open up." (*Id.*, 1541). A trial judge has the responsibility of assuring "that the issues are not obscured and that the testimony is not misunderstood." *United States v. Hickman*, 592 F.2d 931, 933 (6th Cir. 1979)*; United States v. Hynes*, 467 F.3d 951, 958 (6th Cir. 2006). And the logical implication of refusing the government's request to present rebuttal evidence was that Liggins should not be permitted to make his misleading argument to the jury.

Liggins's attorney was also given ample opportunity to explore Jiminez's bias and any alleged "motivation to lie" in closing argument. During his summation, defense counsel emphasized that Jiminez was an "informant," and that the jurors should take what she has to say "with caution and care" because she's "going to get a reduced sentence" and is "going to go home on the recommendation of the government for what [she] told you." (R.136: Tr., 1603–04). Moments later, he reiterated that she was "immunized" "against" "being prosecuted again for anything in this case." (*Id.*, 1610). He questioned whether she was believable, and whether the jurors would really rely on her in making an important decision in their lives. (*Id.*, 1619, 1621). And he reiterated

that her plea agreement "says only for money laundering," and doesn't take into account that she was also part of a drug trafficking organization that involved Mexico, Phoenix and other states. (*Id.*, 1621). Given those opportunities, Liggins cannot show plain error in the district court's decision to prevent him from misleading the jury about the search, especially after the court protected him from the admission of inculpatory evidence.

Liggins offers no cases holding otherwise. He does cite *Herring v. New York*, 422 U.S. 853 (1975) and *Davis v. Alaska*, 415 U.S. 308 (1974), but they both cut against him.

In *Herring*, 422 U.S. at 863, the Supreme Court held that a state court rule was unconstitutional because it permitted a judge presiding over a criminal bench trial "to deny absolutely the opportunity for any closing summation at all." But otherwise, so long as the trial court allows closing arguments, it has significant discretion in "limiting the scope of closing summations." *Id.* at 862. The district court's decision here fell well within that standard.

*Davis* does not help Liggins either. It stands only for the general proposition that "[c]ross-examination is the principal means by which

the believability of a witness and the truth of [her] testimony are tested," because it can reveal "possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand." 415 U.S. at 316. Here, Liggins got his chance to cross-examine Jiminez. Under questioning from Liggins's attorney, Jiminez admitted that she previously came to Detroit "to pay a bribe to somebody to not provide information to law enforcement." (R.134: Tr., 1290). She had been "under investigation as the operator of a drug trafficking organization" in Arizona, but "got a plea deal with the government" that limited her exposure to prison to 37 months and "had nothing to do with drugs." (*Id.*, 1292–93). Instead, she was permitted to plead guilty to money laundering and "got a deal" resulting in less jail time. (*Id.*, 1295). She also admitted that she met with the government prior to testifying. (*Id.*, 1302–03). Far from running afoul of *Davis*, this record establishes that Liggins was given ample opportunity for cross-examination here.

Finally, even assuming the court's limitation on closing argument was misplaced, Liggins cannot show a negative effect on his substantial rights. Defense counsel hammered home that Jiminez got a significant

break with her negotiated money laundering plea deal because she was also "the operator of a drug trafficking organization." (*Id.*, 1290). It is unlikely that adding another potential charge on top of the others already discussed would have tipped the balance for the jurors in Liggins's favor. Liggins's lawyer had already furnished them with considerable evidence that Jiminez avoided more serious drug charges. But even with this information concerning Jiminez's potential bias and purported "motivation to lie," the jury appears to have credited her testimony anyway.

## V.    Liggins's ineffective-assistance-of-counsel claims should be    left for another day.

Liggins scatters allegations of ineffective assistance of counsel throughout his brief, but none of those allegations are sufficiently developed for review on direct appeal. (*See*, *e.g.*, Def. Br. at 17, 29, 39–42, 46). "As a general rule, a defendant may not raise ineffective assistance of counsel claims for the first time on direct appeal, since there has not been an opportunity to develop and include in the record evidence bearing on the merits of the allegations." *United States v. Tucker*, 90 F.3d 1135, 1143 (6th Cir. 1996). Rather, the "customary

procedure" is to permit the defendant to raise his ineffectiveness of counsel claim "in a proper post-conviction proceeding under 28 U.S.C. § 2255." *Id*. Liggins has not established any basis for this Court to deviate from this customary procedure, and his arguments are better suited for resolution with a fully developed record through a § 2255 motion.

## Conclusion

The judgment should be affirmed.

Respectfully submitted,

Dawn N. Ison
United States Attorney

/s/ Erin S. Shaw
Erin S. Shaw
Assistant United States Attorney
Eastern District of Michigan
211 West Fort Street, Suite 2001
Detroit, MI 48226
(313) 226-9182
erin.shaw@usdoj.gov

Dated: December 14, 2022

63

## Certificate of Compliance with Rule 32(a)

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the brief exempted by Rule 32(f), it contains 11,424 words. This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook.

/s/ Erin S. Shaw
Assistant United States Attorney

Dated: December 14, 2022

## Certificate of Service

I certify that on December 14, 2022, I caused this Brief for the United States to be electronically filed with the Clerk of the United States Court of Appeals for the Sixth Circuit using the ECF system, which will send notification of the filing to the following attorney of record:

Wade G. Fink

/s/ Erin S. Shaw
Assistant United States Attorney

# Relevant District Court Documents

The United States of America designates as relevant these documents in the district court's electronic record, Eastern District of Michigan case number 2:18-cr-20071:

| Record No. | Document Description | Page ID Range |
|---|---|---|
| 1 | Indictment | 1–2 |
| 10 | Appearance | 14 |
| 19 | Stipulation | 40–44 |
| 20 | Stipulation | 45–50 |
| 21 | Stipulation | 51–56 |
| 28 | Stipulation | 136–41 |
| 32 | Stipulation | 151–56 |
| 33 | Letter | 157 |
| 34 | Letter | 158–59 |
| 35 | Motion to Withdraw as Counsel | 161–65 |
| 38 | Order | 169–70 |
| 39 | Appointment Order | 171 |
| 40 | Order | 172–77 |
| 42 | First Superseding Indictment | 180–82 |
| 47 | Audio File of Arraignments | n/a |

| Record No. | Document Description | Page ID Range |
|---|---|---|
| 48 | Acknowledgment of First Superseding Indictment | 215–16 |
| 49 | Stipulation | 217–20 |
| 51 | Letter | 222–24 |
| 52 | Motion to Withdraw as Counsel | 226–28 |
| 55 | Appearance | 247–48 |
| 56 | Order | 249–51 |
| 71 | Appearance | 354–55 |
| 80 | Motion Hearing Transcript | 391–99 |
| 88 | Trial Brief | 432–47 |
| 94 | Motion for Recusal | 470–82 |
| 96 | Order Denying Motion for Recusal | 494 |
| 101 | Jury Verdict Form | 620–21 |
| 110 | Motion for New Trial | 649–54 |
| 115 | Response to Motion for New Trial | 661–68 |
| 116-5 | Exhibit | 704 |
| 117 | Order Denying Motion for New Trial | 707–10 |
| 118 | Presentence Investigation Report | n/a |
| 123 | Defendant's Sentencing Memorandum | 786–89 |
| 124 | Judgment | 790–96 |
| 125 | Notice of Appeal | 797 |

| Record No. | Document Description | Page ID Range |
|---|---|---|
| 127 | Status Conference Transcript | 799–810 |
| 128 | Status Conference Transcript | 811–23 |
| 129 | Motion to Withdraw Transcript | 824–30 |
| 130 | Final Pretrial Conference Transcript | 831–47 |
| 131 | Final Pretrial Conference Transcript | 848–77 |
| 132 | Trial Transcript | 878–1073 |
| 133 | Trial Transcript | 1074–1212 |
| 134 | Trial Transcript | 1213–1403 |
| 135 | Trial Transcript | 1404–1564 |
| 136 | Trial Transcript | 1565–1671 |
| 137 | Sentencing Transcript | 1672–1700 |
| 138-2 | Gov. Exhibit 14: Instagram Messages | 1704–28 |
| 138-3 | Gov. Exhibit 15: Dehaven Murphy Plea Agreement | 1729–50 |
| 138-4 | Gov. Exhibit 16: Dehaven Murphy Cooperation Agreement | 1751–55 |
| 138-5 | Gov. Exhibit 32: Luz Jiminez Plea Agreement | 1756–74 |
| 138-6 | Gov. Exhibit 33: Luz Jiminez Cooperation Agreement | 1775–78 |